Commonwealth v. Roberts.

## COMMONWEALTH VS. BRANDON ROBERTS.

Worcester. October 3, 2000. - December 14, 2000.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, & SOSMAN, JJ.

*Homicide. Practice, Criminal,* Capital case, Instructions to jury, Argument by prosecutor, Jury and jurors, Assistance of counsel. *Evidence,* Impeachment of credibility, Rebuttal, Relevancy and materiality, Bias. *Self-Defense. Jury and Jurors.*

Where, at the charge conference at a criminal trial, the defendant requested for the first time an instruction limiting the jury's consideration of certain evidence, the judge correctly denied the request as the evidence had been admitted for all purposes. [48]

At a murder trial, no substantial likelihood of a miscarriage of justice arose from the impeachment of an alibi witness by her pretrial silence, where the proper foundation had been laid. [48-51]

At a murder trial, evidence that the defendant had Worcester, Massachusetts, and New York addresses during 1993 was properly admitted to rebut his alibi witness's testimony that the defendant lived with her in New York for much of 1993 and at the time the victim was murdered in Worcester in 1994 [51-52], and the fact that the defendant had given the information about his addresses to a State trooper during a traffic stop was not prejudicial in light of the judge's limiting instructions [52-53].

At a criminal trial, testimony of two correctional officers, regarding the close relationship of the defendant and a jailmate who testified as a defense witness, was properly admitted as rebuttal on the issue of the witness's bias. [53]

At a criminal trial, any prejudice from a witness's reference to the defendant's being held in the "maximum security block" was cured by the judge's instructions. [53]

At a murder trial, the prosecutor's improper arguments to the jury to hold the defendant accountable for "taking the law into his own hands" did not warrant reversal of the defendant's conviction, where the error went to collateral issues, the judge gave curative instructions, and the evidence against the defendant was strong. [53-55]

At a murder trial, the prosecutor's prejudicial and irrelevant remark that the defendant "lived off" the proceeds of two witnesses' prostitution activities did not create a substantial likelihood of a miscarriage of justice, where it was unlikely that the improper statement would have made a difference in the jury's determination in light of the evidence and the judge's instructions. [55]

At a criminal trial, the prosecutor's reference in closing argument to defense counsel's cross-examination tactics was fair comment. [55-56]

At a murder trial, the evidence did not support a self-defense instruction and the judge properly declined to instruct the jury on the issue. [56-57]

There was no error at a murder trial in the judge's instruction on reasonable doubt. [57]

In a murder case, the judge did not err in denying the defendant's motion for a new trial without conducting a postverdict interview with a juror the defendant claimed was not impartial, where the defendant did not make any showing of extraneous influence on the jury. [57-58]

At a murder trial, there was no error in the judge's instruction on deliberate premeditation. [58-60]

At a murder trial, the judge erred in instructing on all three prongs of malice and not instructing that only first prong malice supports a conviction of deliberate premeditation, the only basis for conviction in the case; however, given the manner of killing, there was no chance that the jury would have relied on any element of malice other than an intent to kill in reaching their verdict. [60-61]

Defense counsel at a murder trial was not ineffective for failing to have objected to the judge's instructions to the jury on malice and premeditation, where the instructions created no substantial likelihood of a miscarriage of justice. [61]

INDICTMENT found and returned in the Superior Court Department on February 26, 1996.

The case was tried before *James F. McHugh, III,* J., and a motion for a new trial, filed on March 5, 1999, was heard by him.

*Matthew S. Robinowitz* for the defendant.

*Ellyn H. Lazar-Moore,* Assistant District Attorney, for the Commonwealth.

COWIN, J. On July 29, 1997, a jury convicted the defendant of murder in the first degree on the theory of deliberate premeditation.[1] We consolidate the appeal from his conviction with his appeal from the trial judge's denial of his motion for a new trial, and affirm both the conviction and the denial of the motion. After reviewing the whole record, we decline to exercise our power under G. L. c. 278, § 33E, to order a new trial or to direct entry of a verdict of a lesser degree of guilt. See *Commonwealth* v. *Nieves,* 429 Mass. 763, 764, 770 (1999).

1. *Facts.* The jury could have found the following facts. During late 1994, the defendant sold drugs from the apartment of Lynn Simmarano (Simmarano), located on the second floor of

---

[1]The jury also convicted the defendant of assault and battery by means of a dangerous weapon on a second victim.

an apartment building at 5 Allen Street in Worcester. The defendant would come to Simmarano's apartment every four days, spend twelve to fifteen hours selling drugs, and depart when his inventory was depleted.

Simmarano, a drug user, obtained drugs from the defendant and also purchased drugs from Pedro Peralta (Peralta) and Elias Cabral (Cabral), who sold drugs from an apartment across the hall. In the first week of December, 1996, Peralta and Cabral came to Simmarano's apartment and threatened to kill the defendant if he did not stop interfering with their drug business. During this exchange, Peralta and Cabral made hand gestures indicating they were carrying guns.

Four or five days after this confrontation over drug territory, the defendant returned to Simmarano's apartment at approximately 10 P.M. with two "big guns." Eddie Jones (Jones) and Lori Ivanits (Ivanits), both drug users,[2] arrived at Simmarano's apartment shortly after the defendant. The defendant showed a gun to Jones and instructed Simmarano to go to the back bedroom because "there were going to be problems with the people across the hall." Simmarano went to her bedroom with Jones and Ivanits to smoke crack. The defendant remained in the living room, nervously pacing the apartment, alternately looking out an apartment window and the front door peephole.

At approximately 4 A.M. on December 9, Cabral and Peralta arrived at 5 Allen Street and proceeded to the second floor. Cabral and Peralta met the defendant in the hallway of the second floor, where Peralta and the defendant argued for approximately ten minutes. While they were both in the hallway, the defendant shot Peralta, who fell to the floor. The defendant went into Simmarano's apartment, and Cabral entered the apartment across the hall (the other apartment). Cabral heard another shot behind him as he headed to the rear of the other apartment. On reaching the back door of the other apartment, Cabral was hit in the arm and stomach by a bullet shot from the other side of the back door. After waiting approximately ten minutes, Cabral left the other apartment through the front door and went to a vehicle that was waiting outside. Cabral was taken to a friend's apartment and then to a hospital, where he was treated for his wounds. Peralta died as a result of the gunshot wound.

The defense was alibi (that the defendant was with his

---

[2]Ivanits bought most of her drug supply from the defendant.

grandmother in New York at the time of the murder) and mis-identification (that another group of Dominican drug dealers killed Peralta).

2. *Failure to give limiting instruction.* The defendant argues that the judge erred in denying his request for a limiting instruction regarding evidence of the defendant's previous involvement with drug activity. Prior to trial, the defendant's motion in limine to exclude evidence of "any alleged drug activities by the defendant" was denied.[3] When evidence on the subject was introduced, no limiting instruction was requested. During the charge conference, for the first time, the defendant requested an instruction limiting the use of the drug evidence to the jury's consideration of motive. The judge denied the request because the evidence had been admitted for all purposes. The defendant renewed this request after the jury charge, and the judge denied it once more. The defendant now claims prejudice from the judge's failure to give the limiting instruction.

There was no error. The defense does not argue that the evidence should not have been admitted; the claim is simply that the limiting instruction should have been given. There was no request for such an instruction at the time the evidence was admitted; thus, the evidence was admitted for all purposes. A judge may refuse to limit the scope of the evidence where the objecting party fails to request limiting instructions when the evidence is introduced: "After the close of the evidence it is too late to present as of right a request for a ruling which is equivalent to a motion that the evidence be stricken . . . ." *Solomon* v. *Dabrowski*, 295 Mass. 358, 360 (1936). The rule makes eminent sense: a party relying on evidence admitted without limitation cannot be placed in the position of later having that evidence limited when it is too late to offer other evidence on the issue.[4]

3. *The prosecutor's questioning of the defendant's grandmother.* The defendant's grandmother testified that the

---

[3]Although the judge never specifically stated the basis for his ruling, the clear implication was that he believed that it was relevant to motive.

[4]In addition to its relevance on the issue of motive, we note that the defendant's status as drug supplier to two of the witnesses would have been relevant to show their relationship to him. As the trial unfolded, motive was not the only issue as to which this evidence could be considered. This was a case where drug dealing and drug dependency were issues that pervaded the entire scenario.

defendant was living in New York City with her on the day of the shootings, and that, on that day, she saw the defendant at about 6 A.M. and again in the evening. During cross-examination, the prosecutor elicited from the grandmother the fact that she had been to the court house every time the case "was on." He then asked her whether, after hearing the testimony at the motion to suppress hearing, she mentioned to anyone that her grandson was with her on the day of the shootings. She did not recall "telling anybody that."[5] The defendant claims that the prosecutor impeached the grandmother without laying a proper

---

[5] THE PROSECUTOR: "Now, Miss, while this case has been going on, you have come from New York a number of times, have you not, to see what was happening in the courthouse on this case, correct?"

THE WITNESS: "I come [sic] to the courthouse all the time the case was on."

". . .

THE COURT: "Did you come to the courthouse, ma'am?"

THE WITNESS: "I have been to the courthouse once."

THE PROSECUTOR: "Miss, in early June you recall we had a hearing in this case in the courtroom right next door and you were present for that hearing, correct?"

THE WITNESS: "I don't remember that. I don't remember if I was there in June. I can't remember that."

THE PROSECUTOR: "About a month ago, a month and a half ago, do you recall some young ladies getting up on the witness stand concerning this case while you were in the courtroom?"

THE WITNESS: "Yes, I was in the courtroom. Yes."

THE PROSECUTOR: "Okay. And those young ladies in your presence gave some testimony about what happened in Worcester in [sic] December 9th, 1994 that you heard, correct?"

THE WITNESS: "Yes."

THE PROSECUTOR: "And a judge was sitting in the courtroom, right?"

THE WITNESS: "The judge was in the courtroom? I can't remember. I really can't remember. I know I was in the courtroom. So please, sir, don't think because I'm not feeling well, I like to get [sic] from the stand now, okay."

THE PROSECUTOR: "Well, let me ask you this last question. After you heard those young ladies give testimony, did you address [to] any policemen, any court official, any prosecutor, what it is you are telling the jury right now?"

THE WITNESS: "What I am telling the jury? That I addressed any one? I did not address any one."

THE PROSECUTOR: "Did you tell anybody that was in the courtroom after you heard those girls testify, that on December 9th, 1994, your grandson was with you in Brooklyn?"

THE WITNESS: "I can't remember telling anybody that."

DEFENSE COUNSEL: "I object."

foundation. This objection was not properly raised at trial.[6] We therefore review to determine whether there was a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Passley*, 428 Mass. 832, 838-839 (1999). In *Commonwealth* v. *Gregory*, 401 Mass. 437, 444-445 (1988), we quoted with approval the appropriate foundational guidelines for raising the issue of pretrial silence, as set forth in *Commonwealth* v. *Brown*, 11 Mass. App. Ct. 288, 296-297 (1981):

> "[B]efore the Commonwealth [may] question a witness on pretrial silence and thereby implicate that witness as having recently fabricated testimony, the Commonwealth must establish that 'the witness knew of the pending charges in sufficient detail to realize that he possessed exculpatory information, that the witness had reason to make the information available, that he was familiar with the means of reporting it to the proper authorities, and that the defendant or his lawyer, or both, did not ask the witness to refrain from doing so.' "

In the circumstances, there was a sufficient foundation for the questioning. The grandmother's testimony that she had been at the court house each time the "case was on"[7] and that she had attended a prior hearing and heard the Commonwealth's evidence of the events that had transpired on December 9, 1994, demonstrated that she was aware of "the pending charges in sufficient detail to realize that [she] possessed exculpatory information." *Commonwealth* v. *Brown, supra* at 296. Her familial relation to the defendant gave her "reason to make the information available." *Id.* The fact that she attended the hearing at least suggested that she was aware of the means by which to report her information to the proper authorities. There

---

THE COURT: "Overruled."

THE PROSECUTOR: "I'm sorry?"

THE WITNESS: "I can't remember telling any one that."

[6]No objection was made until after the witness had answered the prosecutor's question and there was no motion to strike the witness's response. "The objection coming after the question was answered was not timely." *Commonwealth* v. *Baptiste*, 372 Mass. 700, 706 (1977).

[7]We note that the grandmother responded at one point that she was at the court house "all the time the case was on" and later that she was at the court house "once." This discrepancy does not alter our conclusion. Even if she were at the court house only once, it was for a hearing in which the substance of the incriminating testimony was presented.

was no evidence of instructions that would have caused her to refrain from making her information known. See *Commonwealth v. Mahan*, 18 Mass. App. Ct. 738, 744 (1984).

Furthermore, the prosecutor asked only one question in this regard and did not refer to the point in closing argument. That one question was unlikely to have significantly affected the witness's credibility because "[c]ommon sense and the case law dictate that the testimony of a blood relative of the defendant is inherently less credible than the testimony of other witnesses," *Commonwealth v. Thomas*, 429 Mass. 146, 153 (1999). See *Commonwealth v. Hassey*, 40 Mass. App. Ct. 806, 812 (1996) (jury might not be likely to give much weight to exculpatory testimony of defendant's mother). Finally, given the strength of the evidence against the defendant, even were we to conclude that the question intruded into the area of pretrial silence, the transgression would not be of sufficient significance to create a substantial likelihood of a miscarriage of justice.

4. *Rebuttal evidence.* To rebut the grandmother's testimony that the defendant lived with her for much of 1993 and at the time of the shootings, the Commonwealth called a New York State trooper who testified that, when he stopped the defendant on August 24, 1993, the defendant provided him with both a New York and a Worcester, Massachusetts, address. The defendant claims that the evidence was impermissible as too remote.

A judge has broad discretion to permit rebuttal testimony. *Commonwealth v. Howell*, 49 Mass. App. Ct. 42, 50-51 (2000). "Rebuttal is legitimate when it responds to the opponent's case; . . . the judge . . . has a nearly unreversible discretion to allow it." *Commonwealth v. Johnson*, 41 Mass. App. Ct. 81, 89 (1996), quoting *Commonwealth v. Guidry*, 22 Mass. App. Ct. 907, 909 (1986). Further, "[e]vidence is relevant if it has any 'rational tendency to prove an issue in the case.' " *Commonwealth v. Wilson*, 427 Mass. 336, 349 (1998), quoting *Commonwealth v. Fayerweather*, 406 Mass. 78, 83 (1989). "The evidence need not prove the point at issue, so long as it 'render[s] the desired inference more probable than it would have been without it.' " *Commonwealth v. Wilson, supra*, quoting *Commonwealth v. Fayerweather, supra*. "[Q]uestions of relevancy 'are entrusted to the trial judge's discretion and will not be disturbed except for palpable error.' " *Commonwealth v. Wilson, supra*, quoting *Commonwealth v. Azar*, 32 Mass. App. Ct. 290, 300 (1982).

The evidence was clearly relevant to rebut the grandmother's testimony that the defendant lived with her during 1993 and that he did not leave New York City for days at a time. The Commonwealth's evidence demonstrated that, at least in 1993, the defendant left New York City and was in Massachusetts for enough time to claim a Massachusetts address. Thus, the rebuttal evidence directly contradicted the grandmother's testimony, thereby challenging her credibility. Her credibility was key to whether the defendant was at her home in New York City on the day of the shootings. Further, although the particular contradiction concerned the defendant's residence more than one year before the murder, the issue involved (where the defendant resided) was the same in 1993 and in 1994.

The defendant also claims that this evidence prejudiced him because it cast him in a poor light: it indicated that he had prior contact with law enforcement and created a negative inference regarding his character. The judge acted within his sound discretion in determining that the probative value of this evidence outweighed its prejudicial effect. Moreover, the judge carefully limited the potential of any prejudice from this evidence. The Commonwealth was permitted only to elicit evidence that there was a traffic stop and that the defendant provided his address to the police. The fact that narcotics were found as a result of the stop, that the defendant gave the police a false name, and that, as a result of this stop, the defendant was arrested and convicted for possession of drugs, were all excluded. After the trooper testified that he had stopped the defendant and obtained his address, the judge gave a clear and emphatic instruction that the jury could not draw any negative inference from the fact that the defendant had been stopped.[8] The defendant did not object to this instruction or request further instruction. We presume

---

[8] "Now, before we get to the next witness in here, ladies and gentlemen, let me say this to you. You may use that evidence for whatever purpose you deem appropriate when the deliberations begin. But understand that you may not draw any inference from the fact that, if it is a fact, and you will decide it, that there was some contact or there may have been some contact between [the defendant] and a state police officer on the date that the State trooper testified to. It is common knowledge that people are stopped for a variety of things and have contact for a variety of reasons, traffic offenses, for example, are commonly a reason where you have contact, and they are of no consequence once the event and the stop and discussion is over. So don't draw any inference whatsoever from the fact that there was a contact between Roberts and some State police officer in August of '93. Other than that you

that the jury heed such an instruction. *Commonwealth* v. *Degro,* 432 Mass. 319, 328 (2000). The limiting instruction, together with instructions in the final charge about the jury's duty to consider only the evidence in reaching their verdicts, prevented any undue prejudice from this testimony.

The defendant also alleges that the judge improperly permitted the Commonwealth to introduce rebuttal testimony of two correctional officers who testified that the defendant and a defense witness, Brian Donnellan, had been held in the same unit of the jail for two months and that the two spent much time together. One correctional officer testified that the defendant and Donnellan acted "like two brothers." The evidence was admitted to show bias of the witness in favor of the defendant and the trial judge properly exercised his discretion to admit it. *Commonwealth* v. *Guidry, supra* at 909 (rebuttal proper to respond to opponent's case; in any event, judge has "nearly unreversible discretion to allow" rebuttal). See also P.J. Liacos, Massachusetts Evidence § 3.1, at 45 (7th ed. 1999).

The defendant also claims prejudice because one of these officers testified that the defendant was housed in the "maximum security block" of the facility. The defendant objected to the evidence and moved for a mistrial. The judge denied the motion and instead instructed the jury during the witness's testimony that the maximum security section is simply the unit where individuals who have been accused of a criminal offense, but are awaiting trial, are held if they cannot pay the amount of bail that has been set. The judge repeated this instruction after the witness testified and added that one's pretrial custody status "has absolutely nothing to do with whether or not that individual is guilty or not guilty of the offense." Further, in his instructions at the close of the case, the judge repeated the instruction about where people awaiting trial are held and instructed the jury again that they may not draw any inference from one's pretrial custody status. Thus, any prejudice from the reference to the "maximum security block" was cured by the judge's instructions. Again, the jury are presumed to follow the instructions of the judge. *Commonwealth* v. *Degro, supra.*

5. *Closing argument.* The defendant challenges four remarks in the prosecutor's closing argument. We consider two of the contested statements together. The first: "Should [the victim] be

---

may use that testimony for such purposes as you deem appropriate in accordance with the instructions I will give you at the end of the case."

selling dope? Of course not. But who appointed this man the one to take care of him forever?" The defendant claims that this remark characterized him "as a vigilante." The defendant further argues that the prosecutor improperly reminded the jurors of the consequences of their verdict when he stated: "Hopefully in an orderly society governed by law . . . [the defendant] is going to be held accountable of [*sic*] taking the law into his own hands, that is what we are here for."

The two remarks clearly suggest that the prosecutor was arguing that the defendant engaged in a form of private law enforcement, not, as the Commonwealth maintains, that the defendant was simply killing a business competitor. The prosecutor should not have asked the jury to convict the defendant in order to maintain an orderly society. The remarks were no different from similar ones that have been deemed improper. See *Commonwealth* v. *Wilson*, 46 Mass. App. Ct. 292, 298 (1999) (improper to ask jury to "send a message — that this type of action, of behavior is not going to be tolerated"); *Commonwealth* v. *Wallace*, 45 Mass. App. Ct. 930, 931 (1998) (improper to ask jury to consider right of people in neighborhood to feel safe); *Commonwealth* v. *Ward*, 28 Mass. App. Ct. 292, 294-295 (1990) (improper to tell jury they "had duty to confront crime in the streets bravely and to avenge the wrong done the victim"). Similarly, it is not permissible advocacy to ask the jury to hold a person accountable for "taking the law into his own hands" because ours is a "society governed by law."[9]

Because the defendant objected to these statements, we consider whether the prosecutor's error was limited to collateral issues or went to the "heart of the case"; whether the judge gave curative instructions that mitigated the error; and whether the error possibly made a difference in the jury's conclusions. *Commonwealth* v. *Kozec*, 399 Mass. 514, 518 (1987). The statements did not "go to the heart of the case." The heart of the case was the identification of the defendant and the circumstances of the shootings. Further, the judge carefully instructed the jury that the closings were not evidence. At the outset, in preliminary instructions, the judge defined closing argument as

---

[9]Between the above-quoted remarks, the prosecutor stated: "[H]aving nothing to do with law, having something to do with business," and asked the jury to consider all the evidence and come to a fair decision. These statements did not cure the impropriety.

"an opportunity for [counsel] to sum up for you . . . and urge you to look at [the evidence] in the light most favorable to their respective clients." In his final charge, the judge restated that the summations were not evidence, but were comments about evidence. Moreover, the evidence in the case was very strong. There was evidence that the defendant obtained two weapons, prepared for his crime, waited for the victims, and shot them when they arrived, one at close range and the other as he attempted to flee. The witnesses who identified the defendant knew him for weeks or months and physical evidence corroborated the testimony of the Commonwealth's witnesses. Given the strength of the evidence and the judge's instructions to the jury, the improper remarks did not "possibly make a difference in the jury's conclusions." *Id.*

The defendant next claims that the prosecutor improperly stated that "the defendant and the decedent lived off of the proceeds of Ivanits'[s] and Simmarano's prostitution." The defendant contends that this remark "demeaned the defendant" and may have led the jury to believe that he was "a bad person with no scruples against engaging in predatory behavior." Although there was evidence that both Ivanits and Simmarano worked as prostitutes to support their drug habits and that both the defendant and the victim sold drugs to these two women, statements about the source of some of the defendant's income had no relevance to any issue in the case. The argument could only have been for unfairly prejudicial purposes. There was no objection to the statement. Thus, we must consider whether the challenged statement created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Wright*, 411 Mass. 678, 681 (1992). As stated above, the evidence in the case was strong, and the judge instructed the jury that closing arguments were not evidence. It is highly unlikely that this improper statement would have made a difference. Cf. *Commonwealth* v. *Freeman*, 430 Mass. 111, 119-120 (1999).

Finally, the defendant claims that the prosecutor improperly attacked defense counsel for going beyond the "fair game" of impeaching witnesses to "belittle human beings." This was apparently a reference to the defendant's extensive cross-examination of Lori Ivanits and Lynn Simmarano regarding their criminal convictions, and the fact that they were prostitutes and that they received Social Security disability benefits. The entire context of the statement was as follows: "Now, one thing

that was made of their records, those two women, is what? Prostitution, prostitution, prostitution, prostitution. No kidding. Do they hold down a job anywhere? But the thing is why do we need to belittle them even more when they belittled themselves as was done in this room? To impeach by convictions, that's fair game, folks. But to belittle human beings, does it serve your purpose as opposed to embarrassing them." We have said that the prosecutor may comment on defense tactics that the jurors have witnessed themselves. *Commonwealth* v. *Jackson*, 428 Mass. 455, 463 (1998), and cases cited. Defense counsel had gone to considerable lengths to degrade the witnesses and their lifestyles. It was not improper for the prosecutor to comment on this tactic. The prosecutor's reference to defense counsel's going beyond the "fair game" of impeaching witnesses was an attempt "to explain [the defense] tactic to the jury." *Id.* at 463-464.

6. *Jury instructions.* A. *Self-defense instruction.* The defendant claims that the judge abused his discretion by declining to instruct the jury on the issue of self-defense and excessive use of force in self-defense. "A judge must instruct on self-defense in a homicide case if the evidence most favorable to the defendant warrants a reasonable doubt whether 'the defendant: (1) had reasonable ground to believe and actually did believe that he was in imminent danger of death or serious bodily harm, from which he could save himself only by using deadly force, (2) had availed himself of all proper means to avoid physical combat before resorting to the use of deadly force, and (3) used no more force than was reasonably necessary in all the circumstances of the case.' " *Commonwealth* v. *Torres*, 420 Mass. 479, 492 (1995), quoting *Commonwealth* v. *Curtis*, 417 Mass. 619, 632 (1994). The defendant maintains that there was sufficient evidence to meet these three requirements (evidence that "the shooter" had been threatened by Cabral and Peralta four to five days before the shooting and that Cabral and Peralta were armed at the time of the shooting). He argues that, even if there were an opportunity to leave the building before the shooting, the defendant's return with a gun might have been only to frighten the victims or protect himself if attacked. We disagree. As the judge stated, even when viewed in the light most favorable to the defendant, the evidence in the case did not support a self-defense instruction. There was no evidence that the defendant "availed himself of all proper means to avoid physi-

cal combat." *Commonwealth* v. *Torres, supra.* On the contrary, "the evidence tended to show that the defendant initiated the confrontation." *Commonwealth* v. *Reed,* 427 Mass. 100, 103 (1998). The testimony was that the defendant arrived at the apartment with two guns, waited and watched for the victims, and confronted and shot them. Further, there is no evidence that the defendant reasonably believed that he was in imminent danger of death or serious bodily harm; evidence that the victims threatened him several days prior to the shooting will not suffice, and there was no testimony that the victims were armed at the time of the shooting. Because "there was no right to self-defense, a voluntary manslaughter instruction based on the use of excessive force in self-defense [was not] appropriate either." *Commonwealth* v. *Curtis, supra* at 632 n.11.

B. *Proof beyond a reasonable doubt.* The defendant claims that the judge's use of the phrase "moral certainty" in the instructions regarding proof beyond a reasonable doubt was in error because the instruction "failed to provide sufficient context to the term moral certainty." The reasonable doubt charge given was almost identical to that approved in *Commonwealth* v. *Gagliardi,* 418 Mass. 562, 568 n.3, 571-572 (1994), cert. denied, 513 U.S. 1091 (1995).

7. *Motion for a new trial, posttrial interview.* The defendant's initial motion for a new trial raised only one issue: that the defendant was denied his right to an impartial jury as guaranteed by the Sixth Amendment to the United States Constitution and arts. 12 and 29 of the Massachusetts Declaration of Rights because one of the jurors may have known one of the defense witnesses. The judge denied the motion. The defendant now maintains that the trial judge erred in denying his motion without conducting a "post-trial inquiry" of the juror in question. The juror allegedly knew Brian Donnellan, one of the defense witnesses. Donnellan had been in a "sober house," and Donnellan claimed (in an unsigned affidavit) that he recognized one of the jurors as a volunteer at the house.

We do not favor interrogation of jurors unless "there is some showing of illegal or prejudicial intrusion into the jury process." *Commonwealth* v. *Fidler,* 377 Mass. 192, 203 (1979), quoting *United States* v. *Riley,* 544 F.2d 237, 242 (5th Cir. 1976), cert. denied, 430 U.S. 932 (1977). A "[p]ostverdict interview should be initiated only if the court finds some suggestion that there were extraneous matters in the jury's deliberations." *Com-*

*monwealth* v. *Fidler, supra.* There was no showing of extraneous influence on the jury. Donnellan's affidavit was unsigned and thus put no evidence whatsoever before the motion judge. Moreover, all the defendant claimed in his motion for a new trial was that the juror's alleged knowledge that Donnellan had been in a "sober house" might have caused him to be aware of Donnellan's drug problem, thus affecting his view of Donnellan's credibility. However, as the judge noted, information regarding Donnellan's drug problem would have no effect as Donnellan himself testified at trial to his familiarity with drugs. Indeed, he said that he was present at the scene of the crime because of his search for crack, that he smoked crack before the crime occurred, and that he had an extensive involvement in the narcotics trade. The judge properly exercised his discretion in declining to interview the juror.

8. *Amended motion for a new trial.* The defendant's amended motion for a new trial raised two additional issues. He claimed that the judge incorrectly defined deliberate premeditation and malice aforethought. Because there was no objection on either ground, we review these claims to determine whether there was a substantial likelihood of a miscarriage of justice.[10] The defendant claims that the instruction concerning deliberate premeditation erroneously referred only to a "plan" rather than a "plan to kill." The relevant part of the charge is as follows:

> "Before you may consider a verdict of guilty of murder in the first-degree, the evidence must persuade you beyond a reasonable doubt of two separate but related things: that the defendant . . . first of all, unlawfully killed another person, and two, that the killing took place with deliberately premeditated malice aforethought. Let me describe for you now what I mean by each of these two elements.

> "Element one, the first thing the Commonwealth has to prove beyond a reasonable doubt is that defendant . . . unlawfully killed another human being. In this case the Commonwealth has the burden of proving beyond a reasonable doubt that [the defendant] unlawfully killed [the victim]. By unlawful killing, I mean the taking of a

---

[10]The judge did not resurrect these claims in his memorandum and order on the defendant's motion for a new trial. See *Commonwealth* v. *Hallet,* 427 Mass. 552, 554 (1998).

human life, I mean doing an act that directly produces the death of another human being. By unlawful killing I mean a killing in the absence of justification or excuse. Justification or excuse may exist, for example, if the killing occurs by accident, or at a time of war or other circumstances that the law recognizes as a justification or excuse for taking the life of another human being. The Commonwealth, therefore, has the burden of proving beyond a reasonable doubt that [the defendant] killed [the victim], and that the killing was unlawful. That is the first thing that it must prove.

"The second thing that the Commonwealth must prove in order to prove murder in the first-degree has two subparts, both of which the Commonwealth must prove beyond a reasonable doubt. The first is that the defendant . . . acted with deliberate premeditation, and the second, is that he killed [the victim] with malice aforethought. Let me deal with those in that order.

"By deliberate premeditation I mean that the defendant formed a plan after thinking about doing so. Deliberate premeditation doesn't require an [extended] period of thought, nor does it require that the plan be formed slowly. In view of the speed with which the human mind may act, the law does not attempt to set any time limits, and deliberate premeditation may occur over a matter of . . . days, hours or even seconds. Deliberate premeditation is thus a matter of logical sequence rather than a matter of time. The sequence requires first the decision, then a plan, then a critical evaluation of the pros and cons of proceeding with the plan, and lastly action in accordance with that plan. All of that as I said may occur within a few seconds. Nevertheless, in order to prove deliberate premeditation the Commonwealth must prove that the defendant's decision to kill was the product of cool reflection."

Although, as the judge noted, in retrospect, it would have been better to have used the words "to kill" each time the word "plan" was used, in context it is certainly clear that the "plan" in question was a "plan to kill." Notably, at the conclusion of the instruction on the subject, the judge stated that "in order to prove deliberate premeditation the Commonwealth must prove

that the defendant's *decision to kill* was the product of cool reflection." Considering the charge as a whole, the "plan" could only refer to a "plan to kill."[11]

The defendant next contends that the judge erred by instructing on all three prongs of malice and not instructing that only first prong malice supports a conviction of deliberate premeditation. The defendant is correct. "The definition of malice aforethought . . . has three 'prongs:' (1) specific intent to cause death; (2) specific intent to cause grievous bodily harm; or (3) knowledge of a reasonably prudent person that, in the circumstances known to the defendant, the defendant's act was very likely to cause death." *Commonwealth* v. *Judge*, 420 Mass. 433, 437 (1995), citing *Commonwealth* v. *Grey*, 399 Mass. 469, 470 n.1 (1987). "Where only deliberate premeditation is offered to the jury as a basis for murder in the first degree [as was the situation here], the inclusion of instructions on second and third prong malice, even if justified for other reasons, could be confusing . . ." (footnote omitted). *Commonwealth* v. *Jenks*, 426 Mass. 582, 585 (1998). We have also said, however, that, if "[t]he judge's instruction on deliberate premeditation was correct, clear and emphatic, so that 'a reasonable juror could only have understood that a guilty verdict . . . by reason of deliberate premeditation required a finding of purposeful conduct that included a finding beyond a reasonable doubt of a specific intent to kill' . . . there is no basis for concluding that [the error] caused a substantial likelihood of a miscarriage of justice." *Id.*, quoting *Commonwealth* v. *Gibson*, 424 Mass. 242, 247, cert. denied, 521 U.S. 1123 (1997). Here, the judge's instruction on deliberate premeditation was clear and correct. The jury were permitted to convict the defendant of murder in the first degree only if there were proof of a specific intent to kill. And such a jury finding was sufficiently supported by the evidence: a few days before the murder Peralta and Cabral had threatened to kill the defendant if he did not stop "taking their business"; on the day of the murder, the defendant told Simmarano that there were going to be problems; he brought a gun or two guns to the murder scene, watched and

---

[11]In some respects, the defendant received more in the judge's charge than that to which he was entitled. The judge instructed that the sequence requires the inclusion of "a critical evaluation of the pros and cons of proceeding with the plan," a high standard indeed and a requirement never imposed by our law.

waited for the victims while pacing nervously, then confronted them, and shot one victim at close range and the other as he fled. Given the "manner in which the killing occurred in this case, there is no chance that the jury would have relied on any element of malice other than an intent to kill in reaching their verdict." *Commonwealth* v. *Carter*, 429 Mass. 266, 268 (1999).

9. *Ineffective assistance of counsel.* The defendant argues that trial counsel's failure to object to the instructions on malice and deliberate premeditation rendered his assistance ineffective. "[T]he statutory standard of § 33E is more favorable to a defendant than is the constitutional standard for determining the ineffectiveness of counsel." *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). As we have discussed, the instructions to the jury did not create a substantial likelihood of a miscarriage of justice. Thus, they did not adversely affect the jury's verdict. "[I]f a defendant convicted of murder in the first degree is unable to show on his direct appeal that, as to an unpreserved claim of error, there is a substantial likelihood of a miscarriage of justice, he would not prevail by asserting as to the same issue the ineffectiveness of his counsel." *Id.*

10. *Relief pursuant to G. L. c. 278, § 33E.* Having reviewed the whole record, we conclude that there is no reason to exercise our power under G. L. c. 278, § 33E, to order a new trial or to reduce the murder conviction to a lesser degree of guilt. To protect his illegal drug trade, the defendant set out to kill the victim, lay in wait for him, and shot him. The fact that the victim was likewise engaged in plying drug wares does not reduce the cold and calculated nature of the killing.

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*