## COMMONWEALTH *vs.* MICHAEL HART.

Suffolk. May 8, 2009. - October 20, 2009.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, BOTSFORD, & GANTS, JJ.

*Evidence,* Alibi, Impeachment of credibility, Exculpatory, Telephone conversation. *Witness,* Impeachment. *Practice, Criminal,* Conduct of counsel, Argument by prosecutor, Voir dire, Subpoena duces tecum, Capital case. *Rules of Professional Conduct. Subpoena. Imprisonment,* Inmate telephone calls.

At a murder trial, no substantial likelihood of a miscarriage of justice arose from the Commonwealth's impeachment of the defendant's alibi witnesses on cross-examination regarding their failure to speak with police about their evidence of alibi, where the Commonwealth laid a sufficient foundation that the witnesses knew of the charges pending against the defendant in sufficient detail to realize that they possessed exculpatory information, had a reason to make such information available, and were familiar with the means of reporting such information to the police; the Commonwealth was not required to elicit from each witness that he or she was not asked by the defendant or his attorney not to disclose the information to law enforcement authorities. [237-242] MARSHALL, C.J., concurring, with whom BOTSFORD, J., joined.

At a murder trial, no substantial likelihood of a miscarriage of justice arose from the rebuttal of the defendant's alibi witnesses by the admission of portions of two recorded telephone conversations the defendant had with his sister while he was in jail awaiting trial, where, although the Commonwealth improperly subpoenaed the telephone records, no prejudice arose from the invalid subpoena, in that the Commonwealth provided defense counsel a copy of the recorded telephone calls five days before trial and also provided defense counsel with written notice of the calls it planned to use in its case-in-chief or in rebuttal, as well as a transcription of the specific portions of those calls it planned to play for the jury [242-243]; further, the sheriff's production of the telephone calls in response to the subpoena did not violate the defendant's constitutional rights, where the defendant had been warned that the calls at issue were being recorded [243-244], and consequently, there was no merit to the defendant's claim of ineffective assistance [244]; moreover, the admission of the recorded telephone calls, even if error, was harmless in view of the other compelling evidence against the defendant [244]. MARSHALL, C.J., concurring, with whom BOTSFORD, J., joined.

INDICTMENTS found and returned in the Superior Court Department on June 29, 2005.

The cases were tried before *Peter M. Lauriat,* J.

*Ruth Greenberg* for the defendant.

*John P. Zanini,* Assistant District Attorney, for the Commonwealth.

GANTS, J. On the evening of April 30, 2005, the defendant went to the home of Beother Billingslea. On encountering his former girl friend, Tangela Gibson, on the front porch, the defendant slashed her throat. When Billingslea came to Gibson's aid, the defendant stabbed him to death. Based on these events, a jury in the Superior Court convicted the defendant of murder in the first degree of Billingslea on a theory of deliberate premeditation,[1] assault and battery of Gibson by means of a dangerous weapon, and armed assault with intent to murder Gibson. Represented by new counsel on appeal, the defendant argues that a substantial likelihood of a miscarriage of justice arose from the prosecutor's improper impeachment of the defendant's alibi witnesses with their pretrial silence, and from the admission of recorded telephone calls between the defendant and his sister while he was in jail to rebut the testimony of the alibi witnesses. We affirm the defendant's convictions. We also discern no basis to grant relief under G. L. c. 278, § 33E, on the murder conviction.

*Facts.* The jury could have found the following facts from the evidence at trial. Gibson had known the defendant since she was a teenager. They started dating at the end of 2004; a few months later, Gibson moved into the defendant's home on Holiday Street in the Dorchester section of Boston, where he lived with other members of his family.

Gibson had a long-standing cocaine problem.[2] The defendant did not approve of Gibson's use of cocaine, but preferred that, if she were to use drugs, she do so in the house rather than in the street.

A couple of times a week, Gibson visited her "old neighborhood." The defendant did not like Gibson's going to see her friends there, telling her that she did not need anyone but him. Gibson and the defendant argued about her use of drugs and

---

[1]The Commonwealth also had proceeded on a theory of extreme atrocity or cruelty, which the jury rejected.

[2]Tangela Gibson also had an extensive criminal history, including convictions of armed robbery, breaking and entering in the nighttime, assault and battery, and possession of cocaine.

these visits, and the arguments occasionally became physical. The defendant had slapped, choked, and punched Gibson.

Gibson did not always have an exclusive relationship with the defendant. Michael Ferguson, a friend who lived in Quincy, would take her to dinner and to bars, and would give her money to buy drugs and cigarettes.[3] The defendant was aware of, and did not like, Gibson's relationship with Ferguson. The defendant saw Gibson with Ferguson in Dorchester on Valentine's Day in 2005, asked Ferguson his name, and told Ferguson that Gibson was going with him.

On April 29, 2005, Gibson grew tired of the defendant beating her and broke up with him. At approximately 8 P.M. the next evening, she visited Billingslea, who was her friend, in his second-floor apartment in a three-story house on 9 Millet Street in Dorchester, about one-half mile from the defendant's home. Billingslea shared the apartment with two roommates, Willie Haynes and Carl Lubanga.

Gibson had arranged to meet Ferguson at Billingslea's apartment to get drunk and "high." After Ferguson arrived one hour later,[4] Gibson, Ferguson, Billingslea, and Billingslea's friend Robin[5] started drinking, smoking, and ingesting "crack" cocaine in Billingslea's bedroom. Gibson and Robin had an argument, and Robin left. Shortly thereafter, sometime after 10:30 P.M., Ferguson left. Gibson went downstairs to make a telephone call to buy more drugs and to see if she could get a cigarette from Ferguson before he left. When she reached the porch, however, she did not see Ferguson, and the outside door of the house locked automatically behind her.

At approximately 11 P.M., while standing on the porch, Gibson saw the defendant come from the street and walk up the stairs of the porch. She was "kind of scared" when she saw him and tried to knock on the outside door and ring the doorbell.

---

[3]Gibson stated that she had known Michael Ferguson for about ten years, but Ferguson testified that he had only known Gibson for a "few months" prior to April 30, 2005.

[4]Gibson insisted that she went to Billingslea's apartment by herself and was later joined by Ferguson. Lubanga had a similar recollection. However, Ferguson testified that, at around 9 P.M., he and Gibson together arrived at Billingslea's apartment.

[5]Robin's last name was not revealed at trial.

The defendant pulled a knife from his pocket and slit her throat, slashing her from just below one ear to the middle of her neck. Gibson said, "Oh my God, you killed me," to which the defendant replied, "Bitch, I'm sick of this," or words to that effect. After Gibson fell to the porch floor, the defendant stabbed her in the lower part of her rib cage, her abdomen, and the back of her left thigh.

Billingslea came downstairs, opened the front door, and asked the defendant what he had done to Gibson. Gibson crawled inside and up the stairs, yelling for someone to call an ambulance. She heard the sound of "scuffling" feet downstairs.

Upstairs, Haynes tied a towel around Gibson's neck. Gibson was frantic and crying, thinking she was going to die. She told Haynes that the defendant had stabbed her. At 11:06 P.M., at Haynes' request, Lubanga dialed 911. After initiating the call, Lubanga put the telephone down and went downstairs to see if an ambulance was coming, and saw Billingslea lying on the stairs, unresponsive, with knife wounds in his chest and stomach. Haynes spoke again with the 911 operator. At the operator's direction, he obtained information from Gibson, including her statement that the defendant had stabbed her and her description of what the defendant had been wearing (black pants and a light blue sweatshirt).

Police officers responded to 9 Millet Street. It had rained earlier, and the streets, sidewalks, and steps to the front porch were wet. Police found Billingslea on the hallway floor near the door to the front porch. Billingslea was transported to a nearby hospital, where he was pronounced dead as a result of multiple stab wounds.[6]

The police officers went upstairs to Billingslea's apartment and found Gibson, who was screaming and crying. Her hands were covered in blood and she had blood coming out of her neck. She was screaming, "I was stabbed. I'm not going to live. I'm bleeding to death." One officer used his radio to request an ambulance; another used a towel around Gibson's neck to try to

---

[6]The forensic pathologist who performed Billingslea's autopsy testified that a stab wound to the left side of his chest, which penetrated his heart, was a "rapidly fatal injury." A stab wound to his abdomen occurred after this stab wound to his chest. None of Billingslea's wounds was consistent with defensive-type wounds. A toxicology screen revealed that, when he died, Billingslea had both alcohol and cocaine in his blood, but neither contributed to his death.

control the bleeding. Officer Dennis Medina asked who had done this to her, and Gibson replied that her former boy friend, the defendant, had stabbed her. She was able to tell police where the defendant lived and gave a description of the clothing he had worn. She also remarked that, when he stabbed her, the defendant said that he was not afraid to go back to jail. Gibson was taken to a nearby hospital and survived her injuries, even though the wound to her neck was deep and potentially fatal.

At Billingslea's apartment, police found numerous blood-stains, including bloodstains on the front porch and first-floor hallway. Footwear impressions taken from bloodstains on the front porch matched impressions taken from footwear worn by Gibson and Billingslea, but not footwear worn by the defendant. A bloodstain on a shoe seized from the defendant was consistent with the deoxyribonucleic acid (DNA) profile of Gibson. A bloodstain on pants seized from the defendant was consistent with his own DNA profile and contained another blood source from which Gibson could not be included or excluded.

About one week after she had been stabbed, Gibson went to the defendant's home on Holiday Street to collect her belongings. While she was there, the defendant called on the telephone. Gibson spoke with the defendant, and told him she still loved him; he told her that he loved her, too.

In June, the defendant's mother or sister gave Gibson a birthday card and a letter from the defendant. In the birthday card, the defendant asked Gibson to look out for him. The defendant's letter included the following:

> "I have to tell you that you have made a very bad miscalculation, in believing that you can act certain ways with me. I demand more . . . respect than that. Are you trying to get me caught up, and sent to a place I . . . hate . . . . . I'm a grown[-]ass man. One that is not to be played with. You got it fucked up . . . . . If you act like a bitch, I'll treat you like one."

During the cross-examination of several of the Commonwealth's witnesses, the defendant suggested that Ferguson had stabbed the victims because Gibson had been romantically involved with the defendant and Billingslea. In his defense, the defendant called two alibi witnesses, his mother's long-time friend, Maija Leville,

and his nephew, Robert Jammaul Vann. Leville testified that, on the evening of April 30, 2005, she went to the defendant's house and visited with the defendant's mother in the kitchen. At approximately 11 P.M., Leville looked at the clock in the kitchen and remarked that it was time for her to leave. About ten minutes later, the defendant came downstairs to the kitchen and walked Leville to the door. As she drove off, she noticed that the clock in her vehicle read 11:15 P.M.

Vann was living in the defendant's home on April 30, 2005. He testified that, while Leville was visiting with his grandmother (the defendant's mother) in the kitchen that evening, Vann was on the front porch with friends. Late in the evening, Vann observed the defendant escort Leville to her vehicle. On his way back inside the house, the defendant asked Vann for a cigarette but Vann did not have any. The defendant briefly went into the house, then came out and went, on foot, to buy some cigarettes. No longer than fifteen minutes later, the defendant returned and had a cigarette with Vann on the porch, after which they both went into the house.

The defendant testified that he did not go to 9 Millet Street on April 30 and did not commit the attacks on Gibson or Billingslea. The defendant claimed that he was home in his bedroom until 10:55 P.M. on April 30, when he went downstairs into the kitchen and saw his mother; her friend, Leville; and his grandchildren. At about 11:10 or 11:15 P.M., the defendant walked Leville to her vehicle. He then spoke with his nephew on the porch, got some money inside the house, went to a nearby gasoline station to purchase cigarettes, and returned home.

The defendant acknowledged that he was "in recovery" and that he did not like Gibson taking drugs. He admitted to an altercation with Gibson in mid-April, during which each hit the other in the mouth and each had bled. The defendant said he was wearing blue pants and sneakers during this altercation.[7] The defendant admitted that he authored the birthday card and letter given to Gibson in June, 2005, but he stated that he wrote the letter in January, 2005. When asked about the language of the letter quoted above, the defendant said he was "referring to an emotional state of mind" and "the act of addiction."

---

[7] There was no testimony that he had been wearing the pants and sneakers that had been subject to forensic testing by police.

To rebut the defendant's alibi evidence, the Commonwealth, over objection, was permitted to enter in evidence audiotape recordings of portions of two telephone conversations the defendant had with one of his sisters while he was in jail awaiting trial. The jury were not told that the defendant was in jail, but rather, the judge read a stipulation entered into by the parties that stated that the telephone calls were made on the same date by the defendant, who knew he was being recorded. The first conversation was as follows:

| THE DEFENDANT: | "Jack [the defendant's attorney] told me, you know, about his interview with [Vann] and [Leville], you know, so, I, I was glad of that, too, you know." |
|---|---|
| THE DEFENDANT'S SISTER: | "Yeah. Yeah. Oh, he talked to [Vann]." |
| THE DEFENDANT: | "Yeah, he told me. That's what I'm saying." |
| THE DEFENDANT'S SISTER: | "Oh, okay, because last time I talked to him he hadn't quite caught up with him yet." |
| THE DEFENDANT: | "Yeah, yeah, I talked to him, uh, what's today, Saturday? I talked to him on Monday, as a matter of fact — no, Tuesday. Yeah, he said that he had just finished talk[ing] with [Leville], you know." |
| THE DEFENDANT'S SISTER: | "Yeah. So what he talking about?" |
| THE DEFENDANT: | "Ah, you know. They're straightening it out. I don't wanna go into detail on this damn phone, you know." |

The second conversation was as follows:

| THE DEFENDANT: | "Hey listen, but you know, ah, |

|                          | make sure you keep in touch with, ah, G and [Vann], you know, and find out what you can on that situation. You know, and find out what the hell is . . . What they're gonna do. . . ." |
| --- | --- |
| THE DEFENDANT'S SISTER: | "Oh, we know what time it is. Ain't nobody stupid. We know what time it is. But in any event, I, I hear that they're gonna talk to [Leville] again on the twenty-third." |
| THE DEFENDANT: | "Oh yeah?" |
| THE DEFENDANT'S SISTER: | "Yeah, the uh, Jack and the DA or somebody or another. She said, 'Look, I know that he didn't do it. [I] know that at 11:09 he was at the house.' " |
| THE DEFENDANT: | "Yeah, I remember her and mom sitting at the table." |
| THE DEFENDANT'S SISTER: | "Uh-huh, and that's what she told them." |

*Discussion.* 1. *Impeachment of alibi witnesses.* On cross-examination of Leville and Vann, the prosecutor elicited from these alibi witnesses that they had not returned telephone calls from Boston police detectives or otherwise informed the police that they had arrested the "wrong" man. The defendant claims that the prosecutor's impeachment was improper because she had not established a proper foundation for such questions as required under *Commonwealth* v. *Brown*, 11 Mass. App. Ct. 288, 296-297 (1981). He further contends that, as a result, it was improper for the prosecutor to argue in closing that Leville and Vann were not credible because they had failed to speak with police about their evidence of alibi. The defendant did not make this objection at trial so we review to determine whether a substantial likelihood of a miscarriage of justice occurred in the admission of this

impeachment evidence. *Commonwealth* v. *Roberts*, 433 Mass. 45, 50 (2000).

A person ordinarily has no legal obligation to provide exculpatory information to the police. See *Commonwealth* v. *Brown*, *supra* at 295, citing *United States* v. *New York Tel. Co.*, 434 U.S. 159, 175-176 n.24 (1977). "There are many situations, however, where the natural response of a person in possession of exculpatory information would be to come forward in order to avoid a mistaken prosecution of a relative or a friend." *Commonwealth* v. *Brown*, *supra*. When a witness in such circumstances chooses to remain silent rather than provide the police or prosecutors with the exculpatory information, and discloses the information to the prosecution only when called by the defense to testify at trial, it may be a reasonable inference that the exculpatory information is not credible, either because it is a recent contrivance or because the witness is biased toward the defendant. *Id.* at 296-297. See *Commonwealth* v. *Nickerson*, 386 Mass. 54, 57, 58 (1982); *Commonwealth* v. *Cefalo*, 381 Mass. 319, 338 (1980); McCormick, Evidence c. 5 (6th ed. 2006); 3A J. Wigmore, Evidence § 1042 (Chadbourn rev. ed. 1970).

There are some circumstances, though, in which it would not be natural for a witness to provide the police before trial with exculpatory information, such as when the witness does not realize she possesses exculpatory information, when she thinks that her information will not affect the decision to prosecute, or when she does not know how to furnish such information to law enforcement. See *Commonwealth* v. *Brown*, *supra* at 296. In light of these circumstances, the Appeals Court concluded that "some caution is appropriate before a witness's failure to report his information to Commonwealth authorities is introduced to impeach his trial testimony," and required prosecutors to "lay a foundation for this type of cross-examination by first establishing [1] that the witness knew of the pending charges in sufficient detail to realize that he possessed exculpatory information, [2] that the witness had reason to make the information available, [3] that he was familiar with the means of reporting it to the proper authorities, and [4] that the defendant or his lawyer, or both, did not ask the witness to refrain from doing so." *Id.* at 296-297. We later agreed that evidence of an exculpatory defense witness's prior silence is admissible only with this foundation.

See *Commonwealth* v. *Cintron*, 435 Mass. 509, 522-525 (2001); *Commonwealth* v. *Gregory*, 401 Mass. 437, 444-445 (1998); *Commonwealth* v. *Berth*, 385 Mass. 784, 790-791 (1982). Cf. *Commonwealth* v. *Nickerson*, *supra* at 58 n.4 (witness's silence may not be admissible even with this foundation if witness has particular reason for not wanting to speak with police).

The defendant asserts that the impeachment evidence should have been excluded because all four of the foundational elements of *Brown* were not satisfied. We have reviewed the record and conclude that the prosecutor laid a sufficient foundation as to the first three elements, but not the fourth.

As to the first element, both Leville and Vann testified that they were aware that the defendant had been charged with murder shortly after he was arrested; Leville said she learned it from the defendant's mother, while Vann said he read it in the newspaper. Because each witness claimed to be in the physical presence of the defendant at the approximate time the murder took place, it can reasonably be inferred that, after learning about the murder charge, each knew that he or she was in possession of exculpatory information. Both witnesses essentially conceded that they knew they possessed alibi evidence.

As to the second element, the prosecutor established that each witness had a close relationship with the defendant, and therefore would have wished to exonerate him. Leville is the best friend of the defendant's mother and has known her (and her family) for almost forty years. Vann is the defendant's nephew. See *Commonwealth* v. *Cintron*, *supra* at 524 (second factor satisfied by proof that witness was friend of defendant); *Commonwealth* v. *Roberts*, 433 Mass. 45, 50 (2000) (familial relation sufficient).

As to the third element, the prosecutor established that Leville and Vann knew how to make the exculpatory information available to law enforcement officials. The prosecutor elicited evidence that the police had attempted to interview Leville and Vann by telephoning their respective residences and leaving messages, and each witness was aware of the attempted contact. Indeed, Vann telephoned one police officer back to inform the officer that he intended "to speak to nobody."

We now abolish the fourth element: the prosecutor need not elicit from the witness that she was not asked by the defendant

or the defense attorney to refrain from disclosing her exculpatory information to law enforcement authorities. The theory underlying this fourth element is that, when a witness complies with a request by the defendant or the defense attorney not to provide exculpatory information to the police, her credibility may not reasonably be questioned based on her failure to furnish this information to the police. This theory, however, is flawed. While adherence to such a request may not permit an inference of recent contrivance, it may permit an inference of bias in favor of the defendant, if only because such adherence reflects that the witness was willing to do what the defendant or defense attorney asked of her.

Moreover, when a prosecutor seeks to elicit this information from the witness in front of the jury, the prosecutor faces an ethical dilemma. He is asking these questions simply to elicit a negative answer in order to meet the fourth foundational element, and has no good faith basis to believe that either the defendant or the defense attorney asked the witness not to speak to the police. Yet, generally, we do not permit an attorney to pursue a line of questioning "when there is no reasonable expectation of being able to prove the matters to which the line refers." *Abramian* v. *President & Fellows of Harvard College*, 432 Mass. 107, 123 (2000), citing Mass. R. Prof. C. 3.4 (e), 426 Mass. 1389 (1998) ("A lawyer shall not . . . in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence"). See *Commonwealth* v. *White*, 367 Mass. 280, 284 (1975), quoting A.B.A. Standards Relating to The Prosecution Function § 5.7 (d) (Approved Draft 1971) ("The attempt to communicate impressions by innuendo through questions which are answered in the negative, for example . . . 'Did you tell Mr. X that . . .?' when the questioner has no evidence to support the innuendo, is an improper tactic which has often been condemned by the courts").[8] This dilemma is made worse by the fact that, unless the witness is a relative, employee, or agent of

---

[8]It is perhaps for this reason that, when the Court of Appeals of New York adopted foundational requirements before a prosecutor could impeach a defense witness for her failure to provide exculpatory information to law enforcement, it required this fourth foundational element *to be ascertained at a bench* conference, not in front of the jury. *People* v. *Dawson*, 50 N.Y.2d 311, 322-323 (1980). The Appeals Court in *Commonwealth* v. *Brown*, 11 Mass. App. Ct.

the client, an attorney is barred by the Massachusetts Rules of Professional Responsibility from requesting "a person other than a client to refrain from voluntarily giving relevant information to another party." Mass. R. Prof. C. 3.4 (f), 426 Mass. 1389 (1998). Consequently, in many cases, this fourth element would compel a prosecutor who seeks to impeach an alibi witness based on her failure to provide the exculpatory information to the police to ask the witness whether the defense attorney engaged in conduct that would constitute an ethical breach when the prosecutor has no good faith basis to believe that the defense attorney committed any such breach.[9]

While we have not earlier abolished this fourth foundational requirement, we have deemed it satisfied by the absence of evidence that the defendant or his lawyer asked the witness to refrain from disclosing the exculpatory information to the police; we have not required that the witness testify to the absence of such instructions. See *Commonwealth* v. *Cintron*, 435 Mass. 509, 522-525 (2001); *Commonwealth* v. *Roberts*, *supra* at 50-51.[10] We no longer see any reason to preserve an element that may be satisfied by the absence of evidence.

If a defense witness has been requested by a defendant or defense counsel not to provide law enforcement with the exculpatory information, and the defendant wishes to preclude the prosecutor from impeaching the witness for having failed to do so, defense counsel should inform the judge before the witness testifies so that the matter may be explored at a bench conference.

288, 296 (1981), adopted the foundational requirements in *People* v. *Dawson*, *supra*, but did not require the fourth foundational element to be ascertained at a bench conference.

[9]This ethical prohibition became effective in 1998 with the adoption of the Massachusetts Rules of Professional Conduct, S.J.C. Rule 3:07, as appearing in 426 Mass. 1303 (1998), and had no counterpart in the earlier Canons of Ethics and Disciplinary Rules. See G.T. Russell, Massachusetts Professional Responsibility § 34.07, at 34-19 (2d ed. 2003). Therefore, when the Appeals Court in *Commonwealth* v. *Brown*, 11 Mass. App. Ct. 288, 295-297 (1981), set forth these foundational elements and we adopted them in 1982, *Commonwealth* v. *Berth*, 385 Mass. 784, 790-791 (1982), there was no such ethical prohibition.

[10]Consequently, even had we not abolished the fourth foundational element, the impeachment of the alibi witnesses in this case would still not be error because there was no evidence that the defendant or his attorney had asked either Leville or Vann not to speak with the police.

The judge then may consider whether the probative weight of the impeachment is outweighed by the risk of confusion or of unfair prejudice. Even without such information, if a judge wishes to ascertain whether the witness will testify to any such request, the judge may conduct a voir dire examination of the witness. See *Commonwealth* v. *Nickerson*, 386 Mass. 54, 62 (1982) ("A trial judge should feel free to conduct a voir dire on the question of impeachment of a witness . . . by his silence; and, if the evidence is admitted, the judge should, on request, instruct the jury to consider that silence for the purposes of impeachment only if they find that the witness naturally should have spoken up in the circumstances"). If the impeachment evidence is admitted, the defendant is free to elicit on redirect examination the witness's reason for prior silence.

Because the first three foundational elements were met for both Leville's and Vann's cross-examination, there was no error in permitting the impeachment of the defendant's alibi witnesses concerning their prior silence. See note 10, *supra.* Consequently, the prosecutor's statements during her closing argument questioning the credibility of Leville and Vann for having failed to tell the police about their exculpatory information were not improper.[11]

2. *Admission of recorded jailhouse telephone conversations.* The defendant argues that a substantial likelihood of a miscarriage of justice arose from the admission of portions of two recorded telephone conversations the defendant had with his sister while he was in jail awaiting trial for the purpose of rebutting the testimony of his alibi witnesses. These calls were culled from a recording containing eight and one-half hours of recorded calls made from March 21, 2006, through February 23, 2007, and had been produced by the Plymouth County house of correction in response to a trial subpoena issued by the Suffolk County district attorney's office. The defendant claims the telephone calls were improperly admitted because they were obtained by the district attorney in advance of trial without

---

[11]This case does not concern the distinguishable issue of impeachment of a defendant for his failure before his arrest to provide exculpatory information to the police. See *Commonwealth* v. *Nickerson*, 386 Mass. 54, 61 (1982), citing *Jenkins* v. *Anderson*, 447 U.S. 231, 246 (Marshall, J., dissenting) ("To permit the use of his pre-arrest silence, if only for impeachment purposes, suggests that the defendant had a duty to provide incriminating evidence against himself and burdens his right to testify in his own defense").

judicial approval, in violation of Mass. R. Crim. P. 17 (a) (2), 378 Mass. 885 (1979), and *Commonwealth* v. *Lampron*, 441 Mass. 265, 270 (2004). The defendant also contends that production of the telephone calls violated his privacy rights under the State and Federal Constitutions. Conceding that he did not raise these specific objections at trial, the defendant asserts that he received constitutionally ineffective assistance of counsel.

We recently held in *Commonwealth* v. *Odgren, ante* 171, 187 (2009), that the Commonwealth must first obtain judicial approval, pursuant to rule 17 (a) (2), before issuing a subpoena in a criminal case requiring a third party to produce records in advance of trial. In this case, the subpoena was issued pursuant to G. L. c. 277, § 68,[12] and properly set forth the first day of trial as the return date for the production of the documents. The subpoena, however, was invalid because it provided that, in lieu of appearance, the records should be sent to the district attorney's office. "[W]hen subpoenaing records before trial pursuant to rule 17 (a) (2) and [*Commonwealth* v. *Lampron, supra*], the records are to be delivered to the court where the judge may allow the parties and their attorneys to inspect and copy them; the subpoena should not direct that copies of the records be sent directly to the requesting party . . . ." *Commonwealth* v. *Odgren, supra* at 184 n.24.

We also held in *Commonwealth* v. *Odgren, supra* at 188, that suppression of improperly subpoenaed records is not warranted in the absence of prejudice. There was no prejudice here from the invalid subpoena. Defense counsel was provided a copy of the recorded telephone calls five days before trial. On the second day of trial, the judge ordered the Commonwealth to provide defense counsel with written notice of the calls it planned to use in its case-in-chief or in rebuttal, and a transcription of the specific portions of those calls it planned to play. The Commonwealth complied with this order on March 27, 2007; the short portions of two recorded calls were not played for the jury until March 30.

As to the defendant's constitutional claims, we recently held

---

[12]General Laws c. 277, § 68, provides: "The attorney general and district attorneys may issue subpoenas under their hands for witnesses to appear and testify on behalf of the commonwealth, and such subpoenas shall have the same force, and be obeyed in the same manner, and under the same penalties, in case of default, as if issued by the clerk of the court."

in *Matter of a Grand Jury Subpoena*, 454 Mass. 685, 687-688, 692-693 (2009), that the constitutional rights of an adult pretrial detainee, such as the defendant, are not violated when the sheriff provides copies of the detainee's recorded telephone calls in response to a subpoena, provided that all parties have notice that the calls are subject to monitoring and recording, and the monitoring and recording is justified by legitimate penological interests.[13] The defendant acknowledges that he was warned that the calls at issue were being recorded and concedes that the recording of his telephone calls from jail was authorized by legitimate penological interests pursuant to the facility's policies and procedures.

Consequently, even if defendant's trial counsel had objected to the admission of the recorded jailhouse calls, the defendant would still not prevail on appeal on his claim that these calls should have been suppressed. Counsel cannot be found ineffective for failing to raise claims that we have recently rejected.

Moreover, even if the judge had erred in admitting the recorded telephone calls in evidence, the error was harmless in view of the totality of the evidence. The calls added little to the jury's evaluation of the credibility of the alibi witnesses. While the prosecutor could argue that the calls showed that the alibi witnesses were being coached to testify to the defendant's presence at home at the time of the 911 call, defense counsel could argue that the calls simply showed the defendant's legitimate concern that his attorney know of the information that could be offered by the alibi witnesses. Given the compelling weight of Gibson's excited utterances identifying the defendant as her assailant, the forensic evidence of Gibson's blood on the defendant's shoe, and the apparent bias of the defendant's alibi witnesses, we are confident that the jailhouse telephone calls did not affect the trial's outcome.

3. *Conclusion.* We affirm the judgments of conviction and find no reason to exercise our power under G. L. c. 278, § 33E, to grant the defendant any other relief.

*So ordered.*

---

[13]In *Matter of a Grand Jury Subpoena*, 454 Mass. 685, 686 (2009), a grand jury subpoena was at issue, but our reasoning applies equally to a trial subpoena. As in *Matter of a Grand Jury Subpoena, supra*, there is no claim here that the recorded telephone calls were protected by any common-law or statutory privilege. See *id.* at 693.

MARSHALL, C.J. (concurring, with whom Botsford, J., joins). I fully agree with the court's analysis on the first issue, concerning the prosecutor's impeachment of the defendant's alibi witnesses. With respect to the second issue, the admission in evidence of the recorded jailhouse telephone conversations between the defendant and his sister, I disagree, for the reasons stated in my dissenting opinion in *Matter of a Grand Jury Subpoena*, 454 Mass. 685, 693-705 (2009) (Marshall, C.J., dissenting), with the court's conclusion that no constitutionally protected privacy rights of the defendant are implicated. I agree with the court's conclusion, however, in its penultimate paragraph, that the admission of the recordings was harmless in the circumstances of this case.