## Commonwealth vs. Maurice Felder.

Hampden. September 11, 2009. - November 20, 2009.

Present: Marshall, C.J., Ireland, Spina, Botsford, & Gants, JJ.

*Homicide. Practice, Criminal,* Capital case, Discovery, Argument by prosecutor, Instructions to jury. *Evidence,* Photograph.

At a murder trial, the judge did not err in denying the defendant's motion for sanctions based on the Commonwealth's purported noncompliance with its discovery obligations (i.e., its failure to produce certain photographs in a timely manner), where there was no evidence that the Commonwealth had violated its discovery obligation; where, at any rate, the photographs were not exculpatory and were cumulative of testimony from several witnesses; where it could not be said that the defense was unable to make effective use of the photographs; and where the Commonwealth was not permitted to admit the photographs in evidence, thus mitigating any potential prejudice to the defendant. [366-367]

At a murder trial, the prosecutor, in closing argument, did not improperly appeal to the jury's sympathy but rather made a correct statement of the law and a factual reference grounded in the evidence [367-368]; further, the prosecutor did not improperly vouch for the Commonwealth's evidence [368-369] or impermissibly comment on defense tactics [369], and her characterization of certain evidence was a fair inference [369].

The defendant at a murder trial was not entitled to jury instructions regarding one witness's agreement to testify for the prosecution [369], and certain language in the judge's instructions to the jury, which authorized the jury to determine the degree of murder, did not create a substantial likelihood of a miscarriage of justice [369-370].

There was no merit to a criminal defendant's contention that his conviction of armed robbery was duplicative of his conviction of the same victim's murder. [370-371]

Indictments found and returned in the Superior Court Department on March 29, 2005.

The cases were tried before *Cornelius J. Moriarty,* J.

*Stephen Paul Maidman* for the defendant.

*Thomas H. Townsend,* Assistant District Attorney, for the Commonwealth.

Ireland, J. On February 26, 2007, a jury convicted the defend-

ant, Maurice Felder, of murder in the first degree of Tyrone Lewis, Jr., and of Adrian White (each on all three theories of murder); armed robbery of Lewis; unlawful possession of a firearm; unlawful possession of ammunition; and use of a firearm in the commission of a felony.[1] The defendant was tried with Aaron Lester and Derrick Washington (codefendants), who also were convicted of identical charges.[2] On the charges of murder and armed robbery, the Commonwealth had proceeded against all three defendants on the theory of joint venture liability. Represented by new counsel on appeal,. the defendant argues (1) error in the denial of his motion for sanctions based on late production of photographs; (2) error in the prosecutor's closing argument; (3) errors in the judge's instructions to the jury; and (4) that the conviction of armed robbery of Lewis is duplicative and must be vacated. The defendant also requests that, pursuant to our power under G. L. c. 278, § 33E, we vacate the murder convictions and grant him a new trial. We affirm the defendant's convictions and discern no basis to exercise our authority under G. L. c. 278, § 33E.

*Facts.* Based on the Commonwealth's evidence, the jury could have found the following facts. On the afternoon of Sunday, February 6, 2005, Mark Young, Jr., went to a friend's house for a "Super Bowl" party. At the party, Young drank, smoked marijuana, and became intoxicated.[3] At approximately 2:15 P.M., he telephoned his girl friend, Vanessa Fulton, to ask her to pick him up. Fulton drove Young to his home on Suffolk Street in Springfield and put him to bed. Fulton stayed at Young's house for two or three hours while Young slept, and then she left. She made plans to return later that evening.

After Fulton left, Young awoke to a telephone call from the defendant. Young had been friends with the defendant for a number of years, and the defendant had been in Young's home on prior occasions. The defendant told Young that he was downstairs, and Young went to let him in. The defendant was accom-

---

[1]After the close of the Commonwealth's case, the trial judge entered findings of not guilty on the indictments charging the defendant with armed robbery of Mark Young, Jr., armed robbery of Adrian White, and larceny of White's motor vehicle.

[2]We have not yet reviewed the convictions of the codefendants.

[3]Young also sold marijuana.

panied by the codefendants, who proceeded inside Young's home with the defendant. Young was acquainted with Lester and knew Washington to be one of Lester's friends. The codefendants had not previously been inside Young's home.

The men went to Young's bedroom on the second floor where he entertained visitors. There, they asked Young to contact Lewis and to arrange for Lewis to come to Young's home with $400 worth of cocaine. Young knew Lewis and previously had purchased drugs from him. Young was reluctant, but he complied with the defendants' request when Lester brandished a gun. Using his cellular telephone, Young, sometime after 10 P.M., telephoned Lewis with the request.

Approximately twenty minutes later, Lewis arrived. To persuade Lewis to come into the house, the defendants instructed Young to tell Lewis that he (Young) was just getting out of the shower. They forced Young to undress to his underwear. While the defendant stayed upstairs, the codefendants and Young went to the front door on the first floor. The codefendants positioned themselves separately, one at each side of the door, and pointed their guns at Young. Once Lewis entered the house, the codefendants surged on him, pushing and dragging him to the bottom of the stairs. The defendant came downstairs and "pistol whipped" Lewis a couple of times. After beating Lewis, the defendants also forced him to undress to his underwear. Then, the defendants brought Lewis and Young into the "weight room" on the first floor.

At gunpoint, the defendants ordered Lewis to contact his driver and instruct him to come into the house. After doing so, White entered the house. After some commotion ensued, White, in his underwear, was brought into the weight room.

Lewis offered the defendants $20,000 if they would let them go. Interested in the offer, the defendants permitted Lewis to contact his girl friend to make arrangements to get the money. Lewis directed her to retrieve a gift bag out of the closet of her apartment and give it to the man who would be arriving to pick it up. The defendant was sent to get the money, and the codefendants remained with Young, Lewis, and White, keeping the victims at gunpoint.

The defendant arrived at Lewis's girl friend's apartment in a gold automobile driven by an unidentified individual. The defend-

ant went over to Lewis's girl friend, and she handed him the bag as she had been instructed.[4]

The defendant returned to Young's home about twenty minutes after he had left.[5] The defendants went to the adjoining kitchen. Young heard them counting and dividing the money.

The defendants considered taking the victims to the basement, but instead settled on the third-floor attic. Lester led Young up to the attic. Young was given a cellular telephone to illuminate the stairwell as they walked up. On the way up, Young dropped the cellular telephone. Once in the attic, Young found and turned on an overhead light.

Lester asked Young for some bed linens, which Young provided. The defendants used the linens to tie the victims' hands behind their backs. Lester tied up Young; Washington tied up Lewis; and the defendant tied up White. Lester used some linens to wipe off various items or surfaces in the house, presumably to eliminate any fingerprints.

At gunpoint, the defendants ordered the victims to lie on the floor.[6] The defendants discussed whether to shoot the victims one at a time or simultaneously, deciding on simultaneous shootings. As the defendants started a "countdown," Lewis and White cried and begged for their lives, and Young prayed. Lester aimed his gun at Young; Washington aimed his gun at Lewis; and the defendant aimed his gun at White. On the count of "two," Young turned his head and heard a gunshot, and on the count of "three," Young turned his head in Lewis's direction and heard more gunshots. As Young turned his head, he felt heat from a bullet graze his left cheek. He opened his eyes and saw that

---

[4]Lewis's girl friend identified the defendant as the man who picked up the bag after she saw him on television being arraigned.

[5]Sometime after 10:30 P.M., Fulton went back to Young's house. There was a gold automobile in front of his house. After Fulton knocked for some time at the front door, Young answered, but would not let her inside. Young remarked that "there was something serious going on," and asked her to return in twenty minutes. About fifteen to twenty minutes later, Fulton returned. There was no response to her knocks at the house, and Young was not answering his cellular telephone. As she was about to drive away, Fulton saw three black males on Young's porch. She later identified one of them as the defendant.

[6]According to Young, Lester was armed with a nine millimeter semiautomatic handgun; Washington had a .40 or .45 caliber semiautomatic handgun; and the defendant had a .22 caliber Ruger semiautomatic handgun.

Lewis had been shot in the head. For a moment, Young thought that he, himself, was dead and urinated on himself. On realizing that he was alive, he pretended that he was dead.

White got up and jumped over Young's body, running toward the stairs. The defendants chased White, and Young heard more gunshots, followed by what sounded like footsteps running down the stairs. Young got up and realized that he was all right. Young thought Lewis, from his appearance, was unlikely to survive. Young went to an attic window and saw two people getting into an automobile, but could not make out who those two people were. He ran down the stairs and encountered White at the bottom. White was still breathing and was making gurgling sounds. Young told him he would go for help.

Uncertain whether all three defendants had left, Young, still only in his underwear, escaped through a bathroom window. Once through the window, Young stepped on top of the roof of the porch and then jumped to the ground. He ran across the backyard and climbed over a fence into a neighbor's yard. He ran onto Bristol Street, trying to get help from a woman in an automobile, but she did not want to help.[7] He then started knocking on the doors of homes. At one home, an elderly couple answered, let Young inside their home, and telephoned the police.

Sometime in the early morning hours of February 7, 2005, police were dispatched to Young's home. They were informed that there had been a shooting and that there may be injured people as well as perpetrators inside. Police found White at the bottom of the staircase leading to the attic. He had no pulse. White had been shot eight times and died as a result of multiple gunshot wounds. In the attic, police found Lewis. Lewis had a weak pulse and was gasping for air. He was removed from the house by emergency medical technicians. Lewis died shortly thereafter at a hospital as a result of multiple gunshot wounds.[8]

Six .22 caliber spent projectiles and one .45 caliber spent projectile were recovered from White's body.[9] Two .45 caliber

[7] While the woman did not directly come to Young's aid, she did contact police.

[8] Lewis had been shot twice, once in the head and once in the upper back.

[9] Although White had been shot eight times, only seven projectiles were recovered from his body. One bullet had passed through his skull and did not remain inside his body.

spent projectiles were recovered from Lewis's body. From the bathroom of Young's home, police recovered a nine millimeter spent projectile.[10] In addition, one .45 caliber spent projectile was recovered from a ledge along the stairwell leading to the attic.

Police recovered a total of six .22 caliber discharged cartridge casings in Young's house. Two .22 caliber discharged cartridge casings were recovered in the stairwell leading to the attic, and four .22 caliber discharged cartridge casings were found in the attic. Also in the attic, police recovered three .45 caliber discharged cartridge casings and one nine millimeter discharged cartridge casing. No weapons consistent with these discharged cartridge casings or spent projectiles were recovered.

The Commonwealth's firearms identification expert, Trooper John S. Schrijn, testified that, based on his testing, the six .22 caliber discharged cartridge casings recovered were all fired from an unknown weapon capable of chambering and firing .22 caliber ammunition, most likely a semiautomatic pistol. Although three of the six .22 caliber spent projectiles (recovered from White's body) were too damaged to be useful for analysis, testing on the remaining three spent projectiles revealed that they had been fired from the same unknown weapon. Trooper Schrijn further testified that, based on his microscopic comparisons, the three .45 discharged cartridge casings recovered were fired from the same weapon, such as a semiautomatic pistol chambered with .45 caliber ammunition. He concluded that the four .45 caliber spent projectiles recovered (one from White's body, two from Lewis's body, and one from the stairwell of Young's home) were fired from the same weapon.[11]

Deoxyribonucleic acid (DNA) testing revealed that blood consistent with the defendant's was found on a sidewalk outside Young's house. DNA testing also indicated that Lester was a potential contributor of DNA found on a pillowcase recovered

---

[10]Police observed what appeared to be a bullet hole in the ceiling of the bathroom, above which was the attic.

[11]To explain the discrepancy between the number of .45 caliber spent projectiles (four) and the number of .45 caliber discharged cartridge casings recovered (three), Trooper Schrijn testified that the extraction component of a weapon system could malfunction, thereby not fully ejecting a cartridge casing. He also testified that an individual could pick up and carry away a discharged cartridge casing.

from the attic. There was testimony from an officer of the Springfield police department that he observed footprints in the snow in the backyard leading away from Young's house. The footprints were photographed.

Police officers went to Bristol Street to speak with Young. He lied to them, telling them that three masked men had come to his house and had "robbed and shot people." He reiterated this same story at the police station to which he was transported.

Young was afraid to reveal the identities of the defendants because he feared for his personal safety. He also was concerned about several pending charges against him and did not want to be considered a "snitch" if incarcerated.[12] Young wanted the pending charges "cleared up" and wanted to leave the State. After an assistant district attorney spoke with Young at the police station, agreed to dispose of his pending charges, and assured him that he could leave the State, Young revealed the identities of the defendants and provided a detailed account of what had occurred.

At about 1 A.M. on February 7, 2005, the defendant sought treatment at Wing Memorial Hospital in Palmer for a gunshot wound to his left hand. The defendant told the treating physician that he had been shot accidentally at a party that took place in Palmer. When police arrived at the hospital, the defendant told them that he had been shot at a party in Springfield. After the defendant received treatment for his injury, he was arrested and was brought to the Springfield police department. There, his clothing was seized. Inside the defendant's pants, police found and seized $7,000 cash. The money was divided into seven bundles, each bundle comprising $1,000 and wrapped with a black rubber band.[13]

Lester and Washington were arrested later that day, sometime after 3 P.M., when the automobile in which they were traveling was pulled over for a traffic violation. At the time of their arrests, Lester had $5,907 in his possession, and Washington had $6,702.49 in his possession.

---

[12]Young faced charges of possession of marijuana, intimidation of a witness, breaking and entering in the nighttime, and resisting arrest.

[13]Lewis and his girl friend previously had sorted the money into bundles of $1,000 secured with black rubber bands.

The defendants did not testify. Through the cross-examination of the Commonwealth's witnesses and the direct examination of several police witnesses, the defendants attempted to cast doubt on the adequacy of the police investigation. Washington called an alibi witness, who testified that Washington had watched the Super Bowl with her son on February 6, 2005, and left about fifteen minutes after the game had ended. In closing argument, defense counsel argued that the defendant was a victim, as he had suffered a gunshot wound, and that Young was a liar.

*Discussion.* 1. *Sanction for purported noncompliance with discovery obligation.* During the direct examination of Detective Gregory McCain of the Springfield police department, the Commonwealth sought to admit several photographs purporting to depict footprints made by Young in the snow leading from the back of his home and across his yard toward Bristol Street. The defendant objected, claiming that the Commonwealth had not disclosed the photographs to him prior to trial as required under Mass. R. Crim. P. 14 (a) (1) (A) (vii), as appearing in 442 Mass. 1518 (2004). Although the prosecutor represented that she had provided computer discs of the photographs for which the defendant's trial counsel signed as having received,[14] the judge ruled that he would exclude the photographs, but gave the Commonwealth an opportunity to investigate and make a showing that the photographs in fact had been produced. Specifically, he ordered defense counsel to bring the discs to the prosecutor's office and to load them on the prosecutor's computer to determine whether the photographs appeared on the discs. Soon thereafter, the defendant withdrew his objection to the admission of the photographs, and introduced them himself to impeach Detective McCain. After two additional days of trial and after the Commonwealth had rested, the defendant moved for sanctions based on the prosecutor's alleged failure to produce the photographs in a timely manner. The sanction sought by the defendant was a requested jury instruction that the photographs "were not shown to the defendants and their attorneys until after they were described by Detective Gregory McCain during his direct examination." The defendant claims error from the judge's denial of this request.

[14]The prosecutor agreed that the production of the photographs was required pursuant to its automatic discovery obligations under Mass. R. Crim. P. 14 (a) (1) (A) (vii), as appearing in 442 Mass. 1518 (2004).

There is no evidence that the Commonwealth violated its discovery obligation.[15] Even if it did, we find no merit to the defendant's contention that the judge abused his discretion in denying his motion for sanctions. See *Commonwealth* v. *Healy*, 393 Mass. 367, 381 (1984); *Commonwealth* v. *Giontzis*, 47 Mass. App. Ct. 450, 460 (1999). When the Commonwealth fails to comply with its discovery mandate, "the court may make a further order for discovery, grant a continuance, or enter such other order as it deems just under the circumstances." Mass. R. Crim. P. 14 (c) (1), as appearing in 442 Mass. 1518 (2004). When the issue of the timeliness of disclosure is presented, we inquire whether "the defendant is able to make effective use of the evidence in preparing and presenting the case." *Commonwealth* v. *Cronk*, 396 Mass. 194, 200 (1985), and cases cited.

Here, it should be noted that the content of the photographs was not exculpatory and was cumulative of testimony from several police officers that there had been footprints in the snow in Young's backyard. The absence of such photographs would have served to support a claim that these officers (and Young) all lied under oath about the existence of the footprints. or that the police investigation was inadequate on account of the failure of police to record evidence. By withdrawing his objection to the Commonwealth's admission of the photographs and offering the photographs in evidence, the defendant's trial counsel essentially made a decision to abandon such lines of defense in favor of a different strategy that involved using the photographs to impeach Detective McCain. Thus, it cannot be said that the defense was unable to make effective use of the photographs. See *id.* Further, because the Commonwealth was not permitted to admit the photographs, any potential prejudice to the defendant was mitigated. In view of these circumstances, the judge did not err in refusing to instruct the jury as the defendant had requested in his motion for sanctions.

2. *Prosecutor's closing argument.* The defendant claims that the prosecutor's closing argument was improper in four instances.

[15]The defendant's motion came after the issue appeared to have been obviated due to the fact that the defendant withdrew his objection to the admission of the photographs and then introduced them himself to impeach Detective McCain. Thus, the prosecutor was not able to establish whether the disclosure had or had not been made, and the judge had not made any findings on the issue.

Because the defendant did not object to the portions of the prosecutor's closing argument that he now challenges, we review for any substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Maynard*, 436 Mass. 558, 570 (2002). "[P]rosecutors are held to a stricter standard of conduct than are errant defense counsel and their clients." *Commonwealth* v. *Kozec*, 399 Mass. 514, 519 (1987). Remarks made during closing arguments are considered in the context of the whole argument, the evidence admitted at trial, and the judge's instructions to the jury. *Commonwealth* v. *O'Connell*, 432 Mass. 657, 659 (2000), and cases cited.

a. We reject the defendant's contention that the prosecutor's statement, made in the beginning of her closing argument, that "I have the burden of proof and there are two young men dead," improperly appealed to the jury's sympathy. The remark was a correct statement of law and the factual reference was grounded in the evidence. See *Commonwealth* v. *Whitman*, 453 Mass. 331, 345 (2009).

b. The defendant asserts that the prosecutor improperly vouched for the Commonwealth's evidence (with the exception of Young's testimony) when she stated: "Now, much has been said about Mark Young. About his role here. Let's look at the evidence, *let's look at the truth*, and let's leave Mark Young out of it" (emphasis added). "Improper vouching occurs if 'an attorney expresses a personal belief in the credibility of a witness, or indicates that he or she has knowledge independent of the evidence before the jury.' " *Commonwealth* v. *Ortega*, 441 Mass. 170, 181 (2004), quoting *Commonwealth* v. *Wilson*, 427 Mass. 336, 352 (1998). When read in context, the prosecutor was merely urging the jury to examine and find credible the Commonwealth's evidence apart from Young's testimony. This argument was entirely reasonable in light of the defendant's arguments that Young was a liar. After making the comment, the prosecutor went on to focus on specific evidence that corroborated Young's testimony in various respects, such as Fulton's testimony. The prosecutor did not vouch for the credibility of any particular witness (or item of evidence) or indicate any personal knowledge supporting any witness's credibility. The prosecutor's isolated reference to "the truth" was inartful, but "not enough to lead the jury to

improper inferences drawn from presumed personal knowledge."
*Commonwealth* v. *Raymond*, 424 Mass. 382, 391-392 (1997).

c. When read in context, there was no error in the prosecutor's
limited references to the attempts by defense counsel to create
"smoke screen[s]." See *Commonwealth* v. *Jackson*, 428 Mass.
455, 463 (1998) (prosecutor may comment on defense tactics
and in so doing may permissibly use term "smoke screen").

d. There was no error in the prosecutor's characterization of
the results of DNA testing on a pillowcase as not excluding
Lester. The characterization was a fair inference that could be
drawn from a police officer's testimony that Lester was a poten-
tial contributor of DNA found on the pillowcase. See *Com-
monwealth* v. *Whitman, supra.*

3. *Jury instructions.* a. We reject the defendant's claims con-
cerning the judge's failure to give an instruction pursuant to
*Commonwealth* v. *Ciampa*, 406 Mass. 257 (1989), as he was not
entitled to such an instruction. In *Commonwealth* v. *Ciampa,
supra* at 262-263, we held that the prejudicial admission of certain
portions of a written plea agreement between the prosecutor and
a witness, including repeated references to the witness's obliga-
tion to tell the truth, was not cured by the judge's charge. Unlike
the facts in the *Ciampa* case, Young did not enter into a plea
agreement (or immunity agreement) with the Commonwealth to
testify at trial. See *id.* at 260-261. Rather, he made an agreement,
just hours after the murders occurred, to tell the police who shot
the victims and to provide a truthful account of what had oc-
curred, on the condition that the district attorney agree to protect
his safety and dismiss several pending charges. At the time of
trial, Young was no longer facing any pending charges and was
not testifying pursuant to an agreement with the Commonwealth.[16]
The case of *Ciampa* is inapposite. See *Commonwealth* v. *Dixon*,
425 Mass. 223, 233 (1997).

b. The defendant argues that his Federal and State due process
rights were violated when the judge instructed the jury that
"you have a duty, if you find a defendant guilty, to return a
verdict of guilty of the highest crime proven against him beyond

---

[16]Because Young had received consideration prior to trial in exchange for
his cooperation with the investigation, the judge did instruct the jury concern-
ing the issue of promises, rewards, or inducements, as pertaining specifically
to Young.

a reasonable doubt." The defendant asserts that this portion of the charge foreclosed juror discretion in finding the degree of murder. See G. L. c. 265, § 1 ("The degree of murder shall be found by the jury"). The defendant did not object to this portion of the charge below, so our review is limited to whether a substantial likelihood of a miscarriage of justice resulted. See *Commonwealth* v. *Wilson*, 427 Mass. 336, 354 (1998).

The defendant ignores that the judge (who, in addition to instructing the jury on all three theories of murder in the first degree, gave instructions on murder in the second degree and felony-murder in the second degree) made clear in his charge, "It is up to the jury to find the degree of murder, in other words whether it was first or second degree murder." This language was given in accordance with G. L. c. 265, § 1 ("The degree of murder shall be found by the jury"), and our Model Jury Instructions on Homicide 65 (1999). The language, however, does not "endow [jurors] with any power to exercise clemency" and does not convey discretion on jurors "to return a verdict contrary to the facts or the law of the case." *Commonwealth* v. *Paulding*, 438 Mass. 1, 9 (2002), quoting *Commonwealth* v. *Dickerson*, 372 Mass. 783, 812 (1977) (Quirico, J., concurring). Rather, "the language authorizing the jury to determine the degree of murder 'was intended to oblige the jury to find facts within legislative categories.' " *Commonwealth* v. *Paulding, supra* at 8, quoting *Commonwealth* v. *Dickerson, supra* at 805 (Quirico, J., concurring). Considering the judge's charge as whole, see *Commonwealth* v. *Wilson, supra* at 354-355, there was no error. See also *Commonwealth* v. *Noeun Sok*, 439 Mass. 428, 439-440 (2003).

4. *Duplicative convictions.* There is no merit to the defendant's contention that the conviction of armed robbery of Lewis is duplicative of the conviction of Lewis's murder and must be vacated. While the indictment charging armed robbery of Lewis served as the predicate felony for the conviction of felony-murder in the first degree, the jury's verdict on the murder charge was independently supported under the additional theories of deliberate premeditation and extreme atrocity or cruelty. "[W]here, as here, the conviction of murder is based on a theory [or theories] in addition to the theory of felony-murder, the conviction of the underlying felony stands." *Commonwealth* v.

*Brum*, 441 Mass. 199, 200 n.1 (2004), citing *Commonwealth* v. *Pennellatore*, 392 Mass. 382, 390 (1984).

5. *G. L. c. 278, § 33E.* We have examined the record pursuant to our duty under G. L. c. 278, § 33E, and discern no basis on which to grant the defendant relief.

*Judgments affirmed.*