## Commonwealth vs. Derrick Washington.

Hampden. November 5, 2010. - March 3, 2011.

Present: Ireland, Spina, Botsford, & Gants, JJ.

*Practice, Criminal,* Assistance of counsel, Argument by prosecutor, Instructions to jury, Agreement between prosecutor and witness, Capital case. *Constitutional Law,* Assistance of counsel, Search and seizure. *Search and Seizure,* Automobile. *Motor Vehicle,* Seat belt. *Probable Cause. Witness,* Impeachment. *Evidence,* Exculpatory, Alibi.

There was no merit to a criminal defendant's claim that his trial counsel was ineffective in failing properly to challenge the seizure of evidence at a police traffic stop that culminated in the defendant's arrest, with the result that prejudicial evidence was erroneously admitted against the defendant at a murder trial, where the police officer stopping the motor vehicle had probable cause to issue a seat belt warning or citation, and lawful reason to demand identification in order to issue it, based on his observation that the vehicle's passengers (including the defendant) were not wearing seat belts very shortly after the traffic stop, and where the arrest and the discovery by the police of the prejudicial evidence (a large amount of cash in the defendant's pocket) inevitably followed. [38-40]

At a murder trial, the prosecutor did not improperly comment, in closing argument, on the failure of a defense witness to come forward with alibi information on the defendant's behalf, where it was fair to conclude that the witness understood the information she had was of significance to the defendant's serious criminal charges and was potentially exculpatory, and where, in any event, the challenged remark was no more than an offhand comment in the context of a more generalized attack on the accuracy of the witness's recollections of the evening. [41-44]

At a murder trial, the trial judge did not err in declining to instruct the jury in accordance with *Commonwealth* v. *Ciampa*, 406 Mass. 257, 266 (1989), where the evidence did not warrant such an instruction. [44-45]

Indictments found and returned in the Superior Court Department on March 29, 2005.

A pretrial motion to suppress evidence was heard by *Daniel A. Ford,* J.; the cases were tried before *Cornelius J. Moriarty,* J., and a motion for a new trial was heard by him.

*Leslie W. O'Brien* for the defendant.

*Bethany C. Lynch,* Assistant District Attorney, for the Commonwealth.

BOTSFORD, J. A jury in the Superior Court found the defendant, Derrick Washington, along with two codefendants, Maurice Felder and Aaron Lester, guilty of murder in the first degree of Tyrone Lewis, Jr., and Adrian White[1]; the jury also convicted the three of armed robbery of Lewis, unlawful possession of a firearm, unlawful possession of ammunition, and use of a firearm in the commission of a felony.[2] Before us is the defendant's appeal from his convictions as well as his appeal from the denial of his motion for a new trial. The defendant claims that (1) his trial counsel was ineffective in failing properly to challenge the seizure of evidence at a traffic stop that culminated in the defendant's arrest, with the result that prejudicial evidence was erroneously admitted against the defendant at trial; (2) the prosecutor's impeachment of the defendant's alibi witness was improper; and (3) the trial judge erred in declining to instruct the jury in accordance with *Commonwealth* v. *Ciampa*, 406 Mass. 257, 266 (1989) (*Ciampa*). We affirm the defendant's convictions and the denial of his motion for a new trial, and we decline to exercise our power under G. L. c. 278, § 33E.

1. *Background.* In *Commonwealth* v. *Felder*, 455 Mass. 359, 360-366 (2009) (*Felder*), we considered the appeal of one of the codefendants from his convictions. The opinion in *Felder* sets out in some detail the events surrounding the murders of Lewis and White, as presented by the evidence at trial. See *id.* We summarize more briefly here the relevant facts as the jury could have found them.

Mark Young, Jr., became intoxicated at a "Super Bowl" party on Sunday, February 6, 2005, left the party in the afternoon, and returned to his house at 121 Suffolk Street in Springfield, where he went to sleep. A telephone call from Felder at 9:42 P.M. woke Young. Felder said he was downstairs, and Young put on some

---

[1]The jury found the defendant and his codefendants guilty under all three theories of murder in the first degree with respect to each victim. This court has affirmed the convictions of Maurice Felder. *Commonwealth* v. *Felder*, 455 Mass. 359, 360 (2009). Aaron Lester's appeal from his convictions remains pending.

[2]After the close of the Commonwealth's case, the judge entered findings of not guilty on indictments charging the defendant and his codefendants with armed robbery of Mark Young, Jr., and armed robbery of Adrian White. The judge also entered a finding of not guilty on an indictment charging Felder with larceny of a motor vehicle; the defendant did not face a comparable charge.

clothes, walked downstairs, and let Felder into the house, along with Lester and the defendant. Felder had been in the house before, and Young also was acquainted with the other two men.

Once inside the house, Felder and Lester (collectively, co-defendants), joined by the defendant, ordered Young at gunpoint to contact the victim Lewis, who, as Young knew, dealt in cocaine, and to ask him to deliver $400 worth of cocaine. Young did so, and when Lewis arrived, Young lured him into the house at the defendant's and codefendants' direction. Lewis in turn was forced by the defendant and codefendants to call his driver, the victim White, into the house. In an attempt to save his and White's lives, Lewis offered to arrange to retrieve $20,000 in cash from his girl friend, and to give it to the defendant and codefendants. Felder drove to Lewis's house to pick up the money, returned to Young's house, and split the money with Lester and the defendant. Despite having the cash in hand, the defendant and codefendants brought Lewis, White, and Young up to Young's attic, tied them up, and shot at them. Lewis and White died from gunshot wounds, but Lester's bullet missed Young, who pretended to be dead.

Young escaped from the house after the defendant and codefendants had gone. He ran to a neighbor's house, and the neighbor contacted the police at Young's request. Young was driven to the police station in the early morning hours of February 7. Young initially told the police he had been the victim of a home invasion by three masked intruders. While still at the police station that morning, he changed his story after the district attorney, in order to clear the way for Young to leave the Commonwealth, agreed to drop certain criminal charges pending against him. Young then told the police substantially the version of events to which he testified at trial, and identified the three codefendants as the assailants who shot the two victims.

At approximately 3 P.M. on February 7, Trooper Sean Maher of the State police noticed a black Honda automobile traveling south on Route 91 with a loud exhaust system and a missing front registration plate. Maher pulled over the Honda for two motor vehicle violations and asked the driver, Thomas Gonzalez, for his license and registration. As described in more detail *infra*, Maher requested identification from the two passengers in the automobile, Lester and the defendant, after Maher noticed

that they were not wearing seat belts. After obtaining the defend-
ant's and Lester's names, Maher learned through warrant checks
that they had outstanding arrest warrants; he requested backup
and arrested the two passengers.[3] The defendant had $6,720 in
his pocket in paper currency rolled in a wad, plus change.[4]

The defendant did not testify at trial. Through defense wit-
nesses, he suggested sources other than the robbery for the cash
found on him at the traffic stop. The defendant also offered an
alibi witness, Lisa Meriweather, who testified that the defendant
watched the Super Bowl game on February 6, 2005, with her son
in the basement of her house, and that the two young men left
the house about fifteen minutes after the end of the game. In his
closing argument, defense counsel reasoned that when Felder
telephoned Young at 9:42 P.M., the defendant was nowhere near
121 Suffolk Street, the Super Bowl game did not end until
10:30 P.M., and the defendant was at Meriweather's house until
fifteen minutes later. He also emphasized that no forensic evi-
dence — no analysis of blood, fingerprints, or ballistics — con-
nected the defendant to the crime scene.[5]

The jury found the defendant guilty on two indictments charg-
ing murder in the first degree and the related armed robbery and
firearm charges. He timely filed a notice of appeal from his con-
victions. While his appeal was still pending, he filed a motion for
a new trial raising the issues addressed in Part 2. We remanded
the motion to the Superior Court, where the trial judge denied it
after a nonevidentiary hearing. The defendant timely appealed
from the denial of the motion for a new trial, and the consoli-
dated appeal is now before this court.

2. *Evidence of cash found on the defendant.* Prior to trial, the
defendant filed a motion to suppress the items found on him at
the time of the traffic stop that led to his arrest, most notably

---

[3]By the time of the defendant's traffic stop, Felder was already under arrest.
Around 2 A.M. on February 7, police arrested Felder at a hospital in Palmer
where he had presented himself for treatment of a gunshot wound. Felder had
on him $7,103.85.

[4]At the time of his arrest, Lester had $5,907 on his person.

[5]By contrast, the Commonwealth offered forensic evidence at trial that
linked Felder and Lester to the scene of the murders. Lester was a potential
contributor to deoxyribonucleic acid (DNA) found on a pillowcase recovered
from the attic. A swab from a stain, likely blood, found on the sidewalk
outside the house matched Felder's DNA.

$6,720.49 in cash, on the ground that the money was found as a consequence of an unlawful exit order from the Honda in which he was riding, and a subsequent patfrisk. A judge in the Superior Court (motion judge) denied the motion following an evidentiary hearing. The issue presented by the defendant on appeal — raised by the defendant for the first time in his motion for a new trial — is whether trial counsel was ineffective in failing to argue that the State trooper never saw the Honda's passengers without seat belts while they were "riding" in the car, that he lacked probable cause to issue a citation, and that therefore he was unjustified in demanding identification — without which, the argument goes, the trooper would not have discovered the arrest warrant for the defendant on a charge of murder. Pursuant to G. L. c. 278, § 33E, the court examines the defendant's claims of ineffective assistance of counsel to determine "whether there was error at trial and, if so, whether that error was likely to have influenced the jury's conclusion." *Commonwealth* v. *Gaboriault*, 439 Mass. 84, 90 (2003), citing *Commonwealth* v. *Wright*, 411 Mass. 678, 682 n.1 (1992). We find no error, and no ineffective assistance of counsel.

a. *Additional facts.* In his denial of the defendant's motion for a new trial, the trial judge summarized facts he found to be established at trial, and also incorporated the motion judge's findings made during the suppression hearing. We summarize here the facts as found by the motion judge and quoted in the trial judge's memorandum of decision and order on the defendant's motion for a new trial, supplemented by undisputed testimony at the suppression hearing.[6]

At approximately 3 p.m. on February 7, 2005, Trooper Maher made a valid motor vehicle stop of the Honda automobile in which the defendant was traveling on Route 91.[7] Maher approached the vehicle, observed the defendant was seated in the front passenger seat and Lester in the back, and observed that neither wore a seat belt.[8] He asked each of the passengers for

---

[6]Trooper Sean Maher testified about the events of the traffic stop at the hearing on the motion to suppress; the motion judge specifically found him to be a credible witness.

[7]Maher did not see the occupants as the vehicle first drove past him.

[8]Maher testified at the suppression hearing that "this was all in one sequence. I walk up to the vehicle; asked [the driver] for license and registration; observed at the same time that these parties weren't wearing seat belts."

identification because he intended to issue each a citation or warning for failing to wear a seat belt as required by G. L. c. 90, § 13A. As the trooper spoke to him, the defendant became very nervous and began to pat his pants and upper torso, began to look around the vehicle as if looking for something, and said he had no identification. Maher then asked[9] the defendant to step out of the vehicle.[10]

The defendant got out, and identified himself orally as "Derrick Washington." Maher had noticed a bulge consistent with a wallet in the defendant's right front pants pocket; as the defendant left the vehicle, the trooper observed that the bulge appeared to be a large amount of cash partly protruding from the defendant's pocket. Maher pat frisked the defendant, took the money from the defendant, and asked him to sit in the rear of the cruiser because it was a cold day.[11] Thereafter, by running a warrant check from his cruiser, Maher discovered the arrest warrants for murder for the defendant and Lester. Maher requested backup and then arrested both men.

In denying the defendant's motion for a new trial, the trial judge concluded that the exit order and patfrisk were based on Maher's reasonable belief that his safety or that of others was in danger. He also concluded that where the trooper's observation that the defendant was not wearing a seat belt "followed closely on the heels of the stop," Maher could "reasonably suspect"

---

[9]The motion judge found that Maher requested that the defendant get out of the car, as opposed to ordering him to do so. Because we conclude that the discovery of the arrest warrant was the inevitable result of the request for identification, we need not address the motion judge's finding that Maher communicated a request and not an order. See note 16, *infra*.

[10]Maher testified at the suppression hearing that because the defendant was "acting nervous" and said he did not have identification on him, Maher wanted to obtain an oral identification from the defendant while the defendant was separated from the vehicle's other occupants. At trial, Maher further clarified that had the defendant told him a false name and date of birth in the presence of the other vehicle occupants, they would have heard the false identification, and so Maher would not have been able independently to confirm the defendant's identity through them.

[11]Maher testified at the suppression hearing that after the defendant was seated in the back of the cruiser, Maher returned to Gonzalez's car and spoke with the back seat passenger, who produced a learner's permit identifying himself as Aaron Lester. Maher then returned to the cruiser.

the defendant was riding in a vehicle without his seat belt fastened, in violation of G. L. c. 90, § 13A.

b. *Discussion.* The seat belt law provides that "[n]o person shall . . . ride[12] in a private passenger motor vehicle . . . unless such person is wearing a safety belt which is properly adjusted and fastened," with certain limited exceptions that do not apply in this case. G. L. c. 90, § 13A, inserted by St. 1993, c. 387, § 1.[13] Persons over the age of sixteen are subject to a fine of twenty-five dollars if they violate § 13A. *Id.* A police officer generally has no right automatically to demand identification from a passenger in a motor vehicle, see *Commonwealth* v. *Torres,* 424 Mass. 153, 157-158 (1997), but he may make such a demand if he intends to issue a citation for a seat belt law violation and has a valid basis to do so. See *Commonwealth* v. *Goewey,* 452 Mass. 399, 405-406 (2008). While we agree with the defendant that probable cause is the proper standard to justify the issuance of a citation or warning for a violation of the seat belt law, G. L. c. 90, § 13A, we disagree that Trooper Maher lacked the necessary probable cause.

Probable cause is the appropriate level of certainty for the issuance of a seat belt law citation because that issuance concludes a

----

[12]We interpret "ride" to mean to "travel or become conveyed by a vehicle," in accord with its usual dictionary meaning. See Webster's Third New Int'l Dictionary 1952 (1993).

[13]Section 13A states, in relevant part:

"No person shall . . . ride in a private passenger motor vehicle . . . on any way unless such person is wearing a safety belt which is properly adjusted and fastened . . . .

"Any person who operates a motor vehicle without a safety belt, and any person sixteen years of age or over who rides as a passenger in a motor vehicle without wearing a safety belt in violation of this section, shall be subject to a fine of twenty-five dollars. . . . The provisions of this section shall be enforced by law enforcement agencies only when an operator of a motor vehicle has been stopped for a violation of the motor vehicle laws or some other offense.

"Any person who receives a citation for violating this section may contest such citation pursuant to [G. L. c. 90C, § 3]. . . ."

G. L. c. 90, § 13A, inserted by St. 1993, c. 387, § 1. Section 13A was amended in 2008, but the amendment has no bearing on this case. See St. 2008, c. 225 (new seat belt exemption for riders in certain antique cars).

police officer's determination of a civil motor vehicle infraction. See G. L. c. 90C, § 3 (A) (2) (citation must be paid or contested in District Court). The finality of this action distinguishes it from actions that are merely preliminary to the police officer's further investigation. Contrast *Commonwealth* v. *Torres, supra* at 158 (reasonable suspicion required to commence interrogation of passengers regarding criminal activity or other suspicious conduct); *Commonwealth* v. *Baez*, 47 Mass. App. Ct. 115, 118 (1999) (further investigation in form of measuring tint of window followed traffic stop for suspected violation of G. L. c. 90, § 9D). In this limited sense, issuance of a citation is more like an arrest than it is like an investigatory traffic stop, and thus probable cause is the appropriate standard.[14] Cf. *Commonwealth* v. *Stephens*, 451 Mass. 370, 385 (2008), quoting *Commonwealth* v. *Santaliz*, 413 Mass. 238, 241 (1992) ("probable cause exists where, at the moment of arrest, the facts and circumstances within the knowledge of the police are enough to warrant a prudent person in believing that the individual arrested has committed or was committing an offense").

We turn to the probable cause determination. The defendant argues that a person is "riding" in a vehicle only while actually traveling, including while moving or temporarily halted, such as at a red light, but that once a car has been pulled over and stopped, its passengers are no longer "riding" in it. In order for a police officer to have probable cause to believe a passenger

---

[14]While suspicion of criminal activity supported by reasonable articulable facts may justify a brief detention to conduct a threshold inquiry, see *Terry* v. *Ohio*, 392 U.S. 1, 8 (1968); see also *Commonwealth* v. *Bostock*, 450 Mass. 616, 619 (2008), police must have probable cause to justify actions that exceed the bounds of an investigatory stop and thereby amount to an arrest. See *Commonwealth* v. *Borges*, 395 Mass. 788, 794 (1985). See also *Florida* v. *Royer*, 460 U.S. 491, 500 (1983) ("investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time"). Likewise, an officer's reasonable suspicion of a possible, but unconfirmed, motor vehicle violation sufficiently justifies an investigatory traffic stop in order to verify or dispel that suspicion. See *Commonwealth* v. *Eckert*, 431 Mass. 591, 598 (2000) (reasonable suspicion driver was intoxicated would justify field sobriety tests); *Commonwealth* v. *Baez*, 47 Mass. App. Ct. 115, 118 (1999) (reasonable suspicion windows illegally tinted). Issuance of a citation, however, exceeds the bounds of investigatory activity because, necessarily, at the point of issuing a citation, an officer's investigation has already concluded. Police action in issuing a citation is in this way similar to an arrest.

has violated the seat belt law, the defendant claims the officer must directly observe the violation while the passenger is riding, or otherwise reasonably infer the passenger had not been wearing the seat belt. The defendant concedes that an officer who had not observed passengers with their seat belts off while traveling might nonetheless reasonably infer a violation where the officer saw the passengers fastening their seat belts immediately after the car was stopped. He argues, however, that even a short lapse of time between a stop and a direct observation allows sufficient time to unfasten seat belts. Where, as here, Trooper Maher was not asked how much time had passed between the traffic stop and his approach, the defendant would have us draw no inference as to the use of the seat belt while the car was traveling, deeming it equally likely that the passengers had unfastened their seat belts after the stop as that they had not worn them while riding.

We accept the defendant's contention that he was not "riding" in Gonzalez's car at the time that Maher observed him without a seat belt. Nevertheless, although the record offers no quantitative measurement of time elapsed between the stop and Maher's observations of the passengers, it strongly suggests that negligible time had passed.[15] In the circumstances, where the passengers were not wearing seat belts very shortly after the traffic stop, we conclude that Maher reasonably inferred that they probably had not been wearing them while riding in the car. See *Commonwealth v. Cast*, 407 Mass. 891, 895-896 (1990) (probable cause exists in relation to probabilities and reasonable inferences).

Maher thus had probable cause to issue a seat belt warning or citation, and lawful reason to demand identification in order to issue it. As the defendant concedes, if the request for identification was valid, the arrest and the discovery by the police of the cash in the defendant's pocket inevitably followed. There was no error in the admission of the cash at trial, and therefore we find no ineffective assistance of counsel.[16]

---

[15]At the suppression hearing, Maher testified that he pulled over Gonzalez's car and saw the rear registration plate, then got out of the cruiser and approached the car without stopping to "call in" the registration plate number. As noted, see note 8, *supra*, Maher also testified that his actions in approaching the car and observing the absence of seat belts were "all in one sequence."

[16]Pursuant to our authority under G. L. c. 278, § 33E, we may consider the

3. *Impeachment of alibi witness.* The defendant argues that in her closing at trial, the prosecutor improperly commented on Meriweather's failure to come forward with alibi information on the defendant's behalf.[17] "A person ordinarily has no legal obligation to provide exculpatory information to the police." *Commonwealth v. Hart*, 455 Mass. 230, 238 (2009) (*Hart*), citing *Commonwealth v. Brown*, 11 Mass. App. Ct. 288, 295 (1981) (*Brown*). However, where the "natural response" of a person with exculpatory information would be to come forward with that information, a witness's failure to do so may support "a reasonable inference that the exculpatory information is not credible." *Hart, supra,* citing *Brown, supra* at 295, 296-297. Therefore, a witness such as Meriweather may be impeached by her failure to approach police or prosecutors with exculpatory evidence, but only where a proper foundation is laid. *Hart, supra.* Specifically, a prosecutor must first establish "[1] that the witness knew of the pending charges in sufficient detail to realize that he possessed exculpatory information, [2] that the witness had reason to make the information available, [and] [3] that he was familiar with the means of reporting it to the proper authorities." *Id.,* quoting *Brown, supra* at 296-297. See *Hart, supra* at 239-240 (abolishing

other matters raised in the defendant's motion to suppress or his motion for a new trial, but we conclude that in this case, only the validity of the request for identification matters. As the Commonwealth and the defendant now agree, if the request for identification was valid, the inevitable discovery doctrine applies, and the cash in the defendant's pocket would have been discovered in a search incident to arrest, regardless whether there had been an exit order and patfrisk. Therefore, we do not address further the lawfulness of the exit order, if there was one, or of the patfrisk.

[17]The defendant and the Commonwealth disagree on whether defense counsel objected to the claimed error at trial. The defendant points out that his counsel did contend prior to closing arguments that the prosecutor should not be allowed to argue in closing that Meriweather's credibility was impeached by her failure to speak to the police in a timely fashion. However, defense counsel thereafter did not object to the prosecutor's actual closing argument, nor did he request a curative instruction; error, if any, was therefore not preserved. "Failure to object to the closing and to ask for a curative instruction waives the right to claim error on appeal, limiting our inquiry to whether the prosecutor's statements are such that they create a substantial likelihood of a miscarriage of justice." *Commonwealth v. Marquetty*, 416 Mass. 445, 450 (1993). See *Commonwealth v. Johnson*, 374 Mass. 453, 458 (1978) (right to claim error on appeal waived where defense objected to statements after judge instructed jury instead of during, or at close of, prosecutor's argument).

fourth element, that witness was not asked by defendant to refrain from disclosing exculpatory information).

At trial, Meriweather agreed that she knew the defendant faced serious charges in connection with a shooting on the late evening of February 6, 2005, or early morning of February 7, but denied that she thought she had important information relative to the defendant and the charges against him:

THE PROSECUTOR:   "Did you think that you had — at that time that you had some important information relative to [the defendant] and the charges against him?"[18]

THE WITNESS:      "No."

When pressed whether at any point she thought her information to be important, however, she then testified:

THE WITNESS:      "I would just say important as because I knew he was at my house the day before, I mean, watching the Super Bowl. But I didn't know it was that relevant to what had happened."

THE PROSECUTOR:   "So you didn't think that that was relevant; is that your testimony?"

THE WITNESS:      "Correct."

Meriweather later testified, without objection, that she made no effort to tell anybody in law enforcement about the information she possessed. In a sidebar conference with the attorneys before the closing arguments, the trial judge expressed doubt that the Commonwealth had satisfied the first *Brown* element, but he did not make any ruling on the subject. In closing argument, the prosecutor contrasted for the jury Meriweather's very general recollection of the 2005 Super Bowl game itself and events around that time with her "certainty" that the defendant was at her home until fifteen minutes after the game. In that context, the prosecutor posed this question to the jury: "And ask yourself, when did she tell anybody that?"

---

[18]Defense counsel's objection to this question was overruled.

In this case, the parties disagree only about whether the prosecutor satisfied the first *Brown* element, "that the witness knew of the pending charges in sufficient detail to realize that [she] possessed exculpatory information."[19] *Hart*, 455 Mass. at 238. The defendant argues that Meriweather expressly denied that she knew the defendant's presence in her home during the Super Bowl was relevant to the charges he faced, and claims there was no reason shown why she should have realized that the time of the game overlapped with the charged crimes. The Commonwealth argues that her testimony about whether her information was relevant, and about whether she contacted law enforcement, suggests that at some point prior to trial she realized that her information was relevant, yet did nothing.

We think that the Commonwealth adequately satisfied the first *Brown* element, albeit barely. The prosecutor elicited testimony that Meriweather knew the charges were serious and that they concerned events occurring closely in time to when the defendant was allegedly at her house. Somewhat opaquely, as quoted above, Meriweather acknowledged that her alibi information was "important" in that she "knew he was at my house the day before." She also testified that she remembered saying to her son, " 'Where did you go,' you know, because [the defendant] was at the house watching the Super Bowl," suggesting some degree of special concern or interest in the events of the evening. Notwithstanding her testimony that she "didn't think [her knowledge] was that relevant," her connections to the defendant's family support the conclusion that she would have a "natural response" to come forward if she thought she had even potentially relevant information. *Hart*, 455 Mass. at 238, quoting *Brown*, *supra* at 295 (many situations where natural response of person with exculpatory information to come forward in order to avoid mistaken prosecution of relative or friend). We do not understand what distinction Meriweather was attempting to make in conceding her knowledge was "important," yet maintaining she thought

---

[19]The defendant concedes the other two *Brown* elements were satisfied. Meriweather testified that her son was the defendant's friend, and that she and the defendant's father were coworkers, suggesting she had "reason to make the information available" to authorities. *Commonwealth* v. *Brown*, 11 Mass. App. Ct. 288, 296 (1981). She also testified that she worked for the Hampden County house of correction, implying she was "familiar with the means of reporting [information] to the proper authorities." See *id.* at 296-297.

it was not "that relevant." In the final analysis, however, we think it fair to conclude Meriweather understood the information she had was of significance to the defendant's serious criminal charges, and was potentially exculpatory. Her failure to approach law enforcement was therefore a proper subject for comment.

In any event, in her closing argument, the prosecutor made only the briefest use of this information in an argument whose main thrust was that Meriweather's memory was fallible, particularly in comparison to the clearer recollections of Lewis's girl friend.[20] The rhetorical question challenged on appeal was no more than an offhand comment in the context of a more generalized attack on the accuracy of Meriweather's recollections of the evening. Accordingly, even if the *Brown* foundational elements were not satisfied, the prosecutor's question to the jury in her closing argument did not create a substantial likelihood of miscarriage of justice. See *Commonwealth* v. *Montez*, 450 Mass. 736, 750 (2008) (isolated statement in closing argument, even though improper, did not create substantial likelihood of miscarriage of justice).

4. *Jury instruction*. The defendant argues that the judge erred in refusing to instruct the jurors, in accordance with *Ciampa*, 406 Mass. at 266, to study Young's testimony "with particular care" and to warn them that the government does not know whether the witness was telling the truth.[21] *Ciampa* instructions need not be given unless a witness has made a promise to provide

[20] The prosecutor suggested to the jury that for Lewis's girl friend, who would never again see the father of her children, the events of February 6, 2005, had great significance; Meriweather, the prosecutor implied, had less reason to remember that night, and less clear recollections of it, as evidenced by her failure to remember which teams were playing in the Super Bowl, or who won.

[21] Where a *Ciampa* instruction is warranted, the following rules apply. A prosecutor may generally bring out on direct examination the fact that a witness has entered into a plea agreement and understands his obligations under it, but any attempts to bolster the witness by questions concerning his obligation to tell the truth should await redirect examination, and are appropriate only after the defendant has attempted to impeach the witness's credibility by showing the witness struck a deal with the prosecution to obtain favorable treatment. *Commonwealth* v. *Ciampa*, 406 Mass. 257, 264 (1989). A prosecutor in closing argument may then restate the witness's agreement, but commits reversible error if she "suggests that the government has special knowledge by which it can verify the witness's testimony." *Id*. at 265. To guard against an implied representation of credibility, the judge must "specifically and forcefully tell the

truthful testimony for the government. *Commonwealth* v. *Dixon*, 425 Mass. 223, 233 (1997). As we explained in affirming Felder's convictions, "[u]nlike the facts in the *Ciampa* case, Young did not enter into a plea agreement (or an immunity agreement) with the Commonwealth to testify at trial." *Felder*, 455 Mass. at 369, citing *Ciampa*, *supra* at 260-261. Because Young was not facing pending charges at the time of trial, *Ciampa* is inapposite. *Felder*, *supra*. There was no error in the judge's failure to include *Ciampa* instructions in his charge.[22]

5. *G. L. c. 278, § 33E.* We have examined the record of the convictions of murder in the first degree pursuant to our duty under G. L. c. 278, § 33E, and discern no basis on which to grant the defendant relief.

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*

---

jury to study the witness's credibility with particular care." *Id.* at 266, citing *United States* v. *Mealy*, 851 F.2d 890, 900 (7th Cir. 1988). Where the jury are aware of the witness's promise to tell the truth, the judge also should warn the jury that the government does not know whether the witness is telling the truth. *Commonwealth* v. *Meuse*, 423 Mass. 831, 832 (1996), citing *Commonwealth* v. *Ciampa*, *supra* at 264.

[22]In reference to Young, the judge did instruct the jury that they could consider whether a witness expected favorable treatment from the district attorney's office in pending or future cases, or received any promises, rewards, or inducements, and, if so, whether they influenced his testimony. The judge then suggested Young's testimony should be examined with extra care and caution.